**William ALLEN, Plaintiff Below Appellant,**

v.

**ENCORE ENERGY PARTNERS, L.P., Encore Energy Partners GP LLC, Scott W. Smith, Richard A. Robert, Douglas Pence, W. Timothy Hauss, David Baggett, John E. Jackson, Martin G. White, and Vanguard Natural Resoruces LLC, Defendants Below Appellees.**

No. 534, 2012.

Supreme Court of Delaware.

Submitted: May 1, 2013.
Decided: July 22, 2013.

 

Carmella P. Keener, Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware. Of Counsel: Ethan D. Wohl (argued), Wohl & Fruchter LLP, New York, New York for appellant.

Rolin P. Bissell, Kathaleen St. J. McCormick, and Elisabeth S. Bradley, Young Conaway Stargatt & Taylor LLP, Wilmington, Delaware for appellees Vanguard Natural Resources, LLC, Encore Energy Partners LP, Encore Energy Partners GP LLC, Scott W. Smith, Richard A. Robert, Douglas Pence and W. Timothy Hauss.

Srinivas M. Raju and Robert L. Burns, Richards Layton & Finger, P.A., Wilmington, Delaware for appellees, David Baggett, John E. Jackson, and Martin G. White.

Of Counsel: Michael C. Holmes (argued) and Elizabeth C. Brandon, Vinson & Elkins LLP, Dallas, Texas; Ronald L. Oran, Jr., Vinson & Elkins LLP, Houston, Texas; J. Clifford Gunter III and Jonathan Sandlin, Bracewell & Giuliani LLP, Houston, Texas for appellees.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices constituting the Court en Banc.

STEELE, Chief Justice:

This is an appeal from the Court of Chancery's dismissal of a class action complaint challenging the merger of a limited partnership with its general partner's controller. The plaintiff limited partner's complaint alleges that the general partner, its controller, and its directors took actions during and preceding the merger negotiations that breached the contractual duties the limited partnership agreement imposed. The limited partnership agreement replaces common law fiduciary duties with a contractually adopted fiduciary duty of subjective good faith and deems this contractual duty to be satisfied if a committee of independent directors grants "Special Approval" to a transaction, so long as the independent directors themselves act with subjective good faith. We conclude that the plaintiff's allegations that the independent directors failed to negotiate effectively do not permit a reasonable inference that the independent directors breached their duty to act with subjective good faith, and therefore we AFFIRM the Court of Chancery's dismissal of the complaint.

## I. FACTUAL AND PROCEDURAL BACKGROUND [1]

### A. The Parties

This dispute stems from the unit-for-unit exchange (the Merger) by which Van-

---

1. Unless otherwise stated, these facts are drawn from the plaintiff's Verified Consolidated Second Amended Class Action Complaint (the Complaint), the Vanguard Natural Resources, LLC & Encore Energy Partners LP, Joint Proxy Statement/Prospectus (Schedule 14A) (Nov. 10, 2011) (the Proxy Statement), and the Vice Chancellor's Memorandum Opinion, *In re Encore Energy Partners LP Unitholder Litigation*, 2012 WL 3792997 (Del.Ch. Aug. 31, 2012).

guard Natural Resources, LLC (Vanguard) acquired the outstanding limited partnership units of Encore Energy Partners LP (Encore or the Partnership). Before the Merger, Encore was a publicly traded Delaware limited partnership that acquired, developed, and exploited onshore oil and natural gas fields in the United States. The Second Amended and Restated Agreement of Limited Partnership (the LPA) created Encore's governance structure. Plaintiff William Allen held Encore common units from Encore's announcement of the Merger offer until the Merger closed. Allen represents a class consisting of Encore's similarly situated unaffiliated common unitholders.

Encore's general partner is Encore Energy Partners GP LLC (Encore GP), a Delaware limited liability company. Scott W. Smith, Richard A. Robert, Douglas Pence, W. Timothy Hauss, David Baggett, John E. Jackson, and Martin G. White

served on Encore GP's Board of Directors (the Encore Board) at all relevant times. Baggett, Jackson, and White are independent directors and comprised the Encore Board's Conflicts Committee. Directors Smith, Robert, Pence, and Hauss are Vanguard employees. Vanguard, Encore GP, and the Encore Board members are the Defendants in this action.

### B. Vanguard Acquires an Interest in Encore and Encore Makes `Pessimistic Disclosures [2]

■ In late 2010, Vanguard acquired Encore GP and 46% of Encore's common units from a third party.[3] As a result of this transaction, four Encore Board members affiliated with the third party resigned, and Vanguard replaced them with Smith, Robert, Pence, and Hauss. Encore GP appointed Smith and Robert as CEO and CFO, respectively. Vanguard's acquisition caused analysts to speculate that

---

**2.** Allen argues that the Vice Chancellor erroneously considered information disclosed in the Proxy Statement when evaluating Defendants' motion to dismiss. Generally, a judge should not consider matters outside of the pleadings when he rules on a Court of Chancery Rule 12(b)(6) motion. *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 612 (Del.1996) (citing *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 68 (Del.1995)). A judge may consider documents outside of the pleadings only when: (1) the document is integral to a plaintiff's claim and incorporated in the complaint or (2) the document is not being relied upon to prove the truth of its contents. *Id.* at 613 (citing *Santa Fe*, 669 A.2d at 69–70).

Here, the Proxy Statement is integral to the Complaint because Allen quotes from and cites the Proxy Statement almost exclusively in making his allegations regarding the Merger negotiation process and Vanguard's motivations for the transaction. *See* App. to Opening Br. A446–50 (relying on the Proxy Statement for its allegations); *see also Orman v. Cullman*, 794 A.2d 5, 16 (Del.Ch.2002) (holding that a proxy statement was "integral

to [a] complaint as it [was] the source for the merger-related facts as pled in the complaint"). Having premised his factual allegations squarely on the Proxy Statement, Allen cannot fairly, even at the pleading stage, ask a court to draw inferences contradicting the Proxy Statement unless he pleads nonconclusory contradictory facts. *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1026 (Del.Ch. 2012) (citations omitted). This case is unlike *In re Santa Fe Pacific Corp. Shareholder Litigation*, where the plaintiff relied upon a proxy statement for disclosure claims but not for other merger-related claims. 669 A.2d at 69–70. Here, in contrast, Allen only pleads that the Defendants breached their duties under the LPA and relies upon the Proxy Statement for substantive factual allegations. Therefore the Vice Chancellor properly considered the Proxy Statement.

**3.** Vanguard's wholly owned subsidiary, Vanguard Natural Gas, LLC, actually held the Encore units and Encore GP interest. For simplicity, we will refer to Vanguard as if it were the direct owner of the Encore units and Encore GP interests for the remainder of this Opinion.

Vanguard planned to acquire the remaining Encore common units. Encore GP, however, issued a press release on January 3, 2011 (the January Release), in which Smith stated: "We are excited about this acquisition and the prospect of managing a great set of assets for the long-term benefit of the Encore unitholders." The Complaint alleges that the January Release strongly implied that Vanguard had no plans to buy the remaining Encore units. Although the January Release contained no other material information and no other Encore-specific news contemporaneously occurred, Encore's common units dropped 8.2% that week on a market-adjusted basis.

The Complaint alleges that other statements also justify an inference that Vanguard intentionally depressed Encore's unit price before proposing the Merger. In February 2011, Encore issued its fourth-quarter results for 2010 and provided earnings guidance for 2011 (the February Release). Although Encore's 2010 fourth-quarter earnings exceeded analysts' predictions, Encore's 2011 forecasts were downbeat. Encore predicted that 2011 oil and gas production would be lower than analysts' expectations.[4] As it turned out, Encore's actual production during 2011's first three quarters exceeded the February Release's projections.[5]

The February Release also stated that Encore GP planned to triple its capital expenditures. As a result, the February Release forecast that Encore would cut distributions to its unitholders to $1.80–$1.85 per unit. These projected distributions were lower than analysts' expecta-

tions and represented the lowest level of distributions since Encore's initial public offering.[6] During the next two days, Encore's common units fell 5.3% on a market-adjusted basis. In Encore's May 10, 2011 earnings call, CFO Robert emphasized that the increased capital expenditures would provide long-term value to unitholders at the expense of near-term distributions. Because of the proposed Merger (discussed *infra*), this long-term value would flow to Vanguard itself.

Based on these actions, Allen alleges that Encore's unit price at the time Vanguard proposed the Merger reflected "negative pressure from disclosures that were inaccurate and reflected value-depressive policies adopted by Vanguard in the months leading up to the [Merger proposal]."

## C. Vanguard Offers to Acquire Encore's Remaining Common Units

While Encore GP was making the allegedly value-depressing disclosures, Vanguard was planning to propose the Merger, which it had been considering since late 2010. After Vanguard acquired its interest in Encore and Encore GP, Vanguard's management continued to study the potential effects of combining the companies and discussed that possibility with Vanguard's board of directors. Vanguard's management "continued to believe that a combination" of the companies was desirable, but indicated that market conditions and Vanguard's and Encore's relative trading prices were "not conducive to completing a

---

4. Encore projected that it would produce 7930–8350 barrels of oil equivalent per day (BOE/D) in 2011.

5. Encore actually produced 8463, 8534, and 8991 BOE/D during 2011's first three quarters, respectively.

6. Specifically, Encore planned to increase capital expenditures to between $19.5 million and $21.0 million, which was significantly higher than the $6.2 million Encore spent in 2010.

business combination." As a result, they continued monitoring market conditions.

On March 24, 2011, when Encore's unit price closed near a two-week low relative to Vanguard's unit price, Vanguard announced its initial Merger offer. Vanguard proposed to convert each Encore common unit into 0.72 Vanguard common units. Based on Vanguard's closing price that day, the Merger offer implied that each Encore unit was worth $23.20—a 0.2% premium to Encore's preannouncement closing price.[7] The announcement also indicated that Vanguard would not consider selling its Encore or Encore GP interests to a third party and that it would not condition the Merger on a vote by the majority of Encore's unaffiliated unitholders. The Proxy Statement concedes that this foreclosed the possibility that the Encore Conflicts Committee "could conduct a meaningful auction" for Encore. Accordingly, the Conflicts Committee represented the sole procedural protection for Encore's unaffiliated unitholders.

### D. The Encore Board Delegates Authority to its Conflicts Committee and the Conflicts Committee Negotiates with Vanguard

Because a majority of the Encore Board members were Vanguard employees and Vanguard owned Encore GP and 46% of Encore's common units, the Encore Board delegated authority to its Conflicts Committee to "study, review, evaluate, and negotiate" the proposed Merger terms, retain independent advisors, decide whether the proposal, an alternative, or neither option were advisable, and recommend the proposal to the Encore Board if appropri-

ate. Smith had previously advised the Conflicts Committee that Vanguard might propose a merger and recommended that the Conflicts Committee consider engaging independent advisors. The Conflicts Committee selected Bracewell & Giuliani LLP and Richards, Layton & Finger, P.A., as its legal advisors, and Jefferies & Company, Inc., as its financial advisor.

Over the next several days, the Conflicts Committee members negotiated amended indemnification agreements with Encore GP and Encore after consulting with Bracewell & Giuliani. They proceeded to negotiate standstill and confidentiality agreements with Vanguard. After completing these matters, the Conflicts Committee commenced six weeks of due diligence. Allen conceded that the Conflicts Committee informed itself of relevant facts, including the allegedly value-depressive disclosures and the companies' relative unit prices.[8]

On June 15, 2011, the Conflicts Committee responded to Vanguard's offer by proposing a 1:0.75 exchange ratio, which was 4.17% higher than Vanguard's opening offer. The Proxy Statement indicates that the Conflicts Committee members made this counteroffer because they believed Vanguard would not agree to an exchange ratio that would dilute Vanguard's distributable cash flow per unit, an important metric for master limited partnerships. During the period between Vanguard's offer and the Conflicts Committee's response, however, Vanguard units had experienced a company-specific price drop. As a result, the counteroffer now represented a 9.1% discount to Vanguard's opening offer. Vanguard countered with a

---

7. Encore units closed at $23.15 on March 24, 2011.

8. Allen explicitly conceded before the Vice Chancellor that the Conflicts Committee knew of the disclosures and the relative unit prices

of Vanguard and Encore. See In re Encore Energy P'rs LP Unitholder Litig., 2012 WL 3792997, at *4 n. 20 (Del.Ch. Aug. 31, 2012) (citations omitted).

1:0.74 offer, but it finally agreed to the Conflicts Committee's 1:0.75 exchange ratio.

In connection with the Merger, Jefferies rendered a fairness opinion stating that the Merger's terms were financially fair.[9] The valuation metrics in Jefferies's opinion, however, indicated that the Conflicts Committee's 1:0.75 opening counteroffer was below the midpoint of the average valuation range reflected in the fairness opinion. Allen asserts that industry-specific valuation methods (the "net asset value" analysis Vanguard's financial advisor used and an "enterprise value to standardized measure" analysis) reveal a fair value range higher than the final Merger's exchange ratio.

On July 10, 2011, after reviewing Jefferies's fairness opinion and consulting with its legal advisors, the Conflicts Committee unanimously approved the Merger and recommended it to the Encore Board, which in turn approved the Merger and submitted it to the unitholders. Vanguard's trading price on the last trading day before the Encore Board approved the Merger implied a valuation of $21.94 per Encore unit, below the implied valuation in Vanguard's original offer. Based on Vanguard's pre-Merger quarterly distribution projections, Encore's unitholders would initially receive lower distributions after exchanging their units for Vanguard units than they would have received had they remained Encore unitholders.

### E. Encore's Unitholders Approve the Merger and the Transaction Closes

On November 30, 2011, a majority of Encore's unitholders (including Vanguard as a 46% unitholder) approved the Merger at a special meeting. When the Merger closed on December 1, 2011, the exchange ratio implied a valuation of Encore at $20.82 per unit—again below Vanguard's original offer.

### F. Procedural History

This litigation began in April 2011, shortly after Vanguard made its initial acquisition proposal. Allen and another plaintiff filed the operative Complaint on December 28, 2011, after the unitholders' special meeting that approved the Merger. The Complaint alleged that the Defendants breached their contractual duties to the class members by proposing, approving, and consummating a transaction that was unfair, unreasonable, and undertaken in bad faith. The Defendants moved to dismiss all of Allen's claims, and the Vice Chancellor granted their motion in his Memorandum Opinion.[10] Allen appeals from the Vice Chancellor's order dismissing his Complaint.

---

9. As the Vice Chancellor noted, the Proxy Statement inconsistently describes the extent of Jefferies's advice to the Conflicts Committee. *Id.* at *4 n. 18. Although the Proxy Statement indicates that the Conflicts Committee met with Jefferies before making its counteroffer, Jefferies's fairness opinion states that "we were not requested to and did not provide advice concerning the structure, the determination of the specific [e]xchange [r]atio, or any other aspects of the Merger, or to provide services other than the delivery of this opinion." App. to Opening Br. A435. We must draw all reasonable inferences in Allen's favor when considering a motion to dismiss under Court of Chancery Rule 12(b)(6), *Central Mortgage Co. v. Morgan Stanley Mortgage Capital Holdings LLC*, 27 A.3d 531, 535 (Del. 2011) (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del.2002)), and therefore, for the purposes of this Opinion, we conclude that Jefferies's advice was limited to its fairness opinion.

10. *In re Encore Energy P'rs LP Unitholder Litig.*, 2012 WL 3792997 (Del.Ch. Aug. 31, 2012).

## II. STANDARD OF REVIEW

■■■■ We review *de novo* the Vice Chancellor's decision to grant a motion to dismiss under Court of Chancery Rule 12(b)(6).[11] When reviewing a motion to dismiss, we accept all well-pleaded allegations as true and draw all reasonable inferences in the plaintiff's favor.[12] We will only dismiss a plaintiff's claims if we conclude that the plaintiff would not be entitled to relief under any set of provable facts supporting his claims.[13] We do not, however, credit conclusory allegations that are unsupported by specific facts or draw unreasonable inferences in the plaintiff's favor.[14]

## III. ANALYSIS

### A. What Contractual Standards Apply to the Defendants?

This Opinion is the latest in a series of cases involving conflicted transactions in the master limited partnership context.[15] Although the limited partnership agreements in these cases contain similar provisions, those facial similarities can conceal significant differences between the limited partnership agreements. This is understandable because the Delaware Revised Uniform Limited Partnership Act (DRULPA) is intended to give "maximum effect to the principle of freedom of contract."[16]

Therefore, we begin our analysis by examining what duties the Defendants owe to Encore's limited partners under this LPA's precise language.

Under the DRULPA, a limited partnership agreement may "expand[ ] or restrict[ ] or eliminate[ ]" any fiduciary duties a partner or other person owes to a limited partnership, another partner, or other person, "provided that the partnership agreement may not eliminate the implied contractual covenant of good faith and fair dealing."[17] The LPA's drafters took advantage of DRULPA's flexibility in Section 7.9(e), which provides:

> Except as expressly set forth in [the LPA], *neither [Encore GP] nor any other Indemnitee shall have any duties or liabilities, including fiduciary duties, to the Partnership or any Limited Partner* ... and the provisions of [the LPA], to the extent that they restrict, eliminate or otherwise modify the duties and liabilities, including fiduciary duties, of [Encore GP] or any other Indemnitee otherwise existing at law or in equity, are agreed by the Partners to replace such other duties and liabilities of [Encore GP] or such other Indemnitee.[18]

As the Vice Chancellor held, this provision indicates that Encore GP and each Indemnitee only owe the fiduciary duties expressed in the LPA; they do not owe

---

11. *In re General Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 167–68 (Del.2006) (citing *Malpiede v. Townson*, 780 A.2d 1075, 1082 (Del.2001)).

12. *Id.* at 168 (citing *Malpiede*, 780 A.2d at 1082).

13. *Gantler v. Stephens*, 965 A.2d 695, 703 (Del.2009) (citing *Feldman v. Cutaia*, 951 A.2d 727, 731 (Del.2008)).

14. *Id.* at 704 (citing *General Motors*, 897 A.2d at 168).

15. *E.g., Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400 (Del.2013); *Norton v. K–Sea Transp. P'rs L.P.*, 67 A.3d 354 (Del.2013); *Brinckerhoff v. Enbridge Energy Co.*, 67 A.3d 369 (Del. 2013).

16. 6 *Del. C.* § 17–1101(c).

17. 6 *Del. C.* § 17–1101(d). Allen does not appeal from the Vice Chancellor's dismissal of his implied covenant of good faith and fair dealing claim.

18. App. to Opening Br. A85 (emphasis added).

common law fiduciary duties.[19] The LPA defines "Indemnitee" to include "any Person who is or was an Affiliate of [Encore GP]."[20] In turn, the LPA defines "Affiliate" to mean:

> [W]ith respect to any Person, any other Person that directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with, the Person in question. As used herein, the term "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.[21]

This definition encompasses the Encore Board members, who possess the power to control Encore GP by virtue of their positions. Because Vanguard controls Encore GP through its ownership interest, Vanguard also comes within the definition of "Affiliate." Therefore, Section 7.9(e) applies to all Defendants.

The LPA creates a contractual duty that replaces the common law fiduciary duties Section 7.9(e) eliminates. Section 7.9(b) requires that when Encore GP "makes a determination or takes or declines to take any other action, or any of its Affiliates causes it to do so," in its capacity as Encore's general partner, Encore GP and its Affiliates shall "make such determination or take or decline to take such other action in good faith."[22] Section 14.2(a) requires Encore GP to consent before Encore can merge with another entity.[23] Therefore, when "determin[ing] to consent" to a merger, Encore GP and its Affiliates must act in accordance with the LPA's contractual duty of good faith.[24] The LPA defines "good faith" as a "belie[f] that the determination or other action is in the best interests of the Partnership."[25] Unlike the contractual duty of good faith in *Norton v.*

---

19. *In re Encore Energy P'rs LP Unitholder Litig.*, 2012 WL 3792997, at *8 (Del.Ch. Aug. 31, 2012); *see also Lonergan v. EPE Hldgs., LLC*, 5 A.3d 1008, 1017 (Del.Ch.2010) (construing a similar provision).

20. App. to Opening Br. A29. The LPA defines "Person" to include entities. *Id.* at A34. The LPA's entire definition of Indemnitee includes:

> (a) [Encore GP], (b) any Departing General Partner, (c) any Person who is or was an Affiliate of [Encore GP] or any Departing General Partner, (d) any Person who is or was a member, partner, director, officer, fiduciary or trustee of any Group Member, [Encore GP] or any Departing General Partner or any Affiliate of any Group Member, [Encore GP] or any Departing General Partner, (e) any Person who is or was serving at the request of [Encore GP] or any Departing General Partner or any Affiliate of [Encore GP] or any Departing General Partner as an officer, director, member, partner, fiduciary or trustee of another Person; provided that a Person shall not be an Indemnitee by reason of providing, on a

fee-for-services basis, trustee, fiduciary or custodial services, and (f) any Person [Encore GP] designates as an "Indemnitee" for purposes of [the LPA].
> *Id.*

21. *Id.* at A22.

22. *Id.* at A84.

23. *Id.* at A106.

24. While Section 14.2(a) allows Encore GP to *decline* to consent to a merger "free of any fiduciary duty or obligation whatsoever to the Partnership," that provision does not apply when Encore GP *affirmatively* consents to a merger. *Id.* at A106–07; *see also In re Atlas Energy Res., LLC*, 2010 WL 4273122, at *13 (Del.Ch. Oct. 28, 2010) (concluding that an LLC agreement that provided that a board of directors could decline to consent to a merger "free of any fiduciary duty" continued to subject the board of directors to a contractual duty if they chose to approve a merger).

25. App. to Opening Br. A84.

*K–Sea Transportation Partners L.P.*, this LPA does not require a reasonable belief.[26]

Finally, Section 7.8(a) exculpates Indemnitees "for losses sustained or liabilities incurred as a result of any act or omission of an Indemnitee" unless a court enters a judgment determining that "the Indemnitee acted in *bad faith* or engaged in fraud, willful misconduct or, in the case of a criminal matter, acted with knowledge that the Indemnitee's conduct was criminal." [27] The LPA does not define "bad faith."

### B. The LPA's Provisions Governing Conflicts of Interest

LPA Section 7.9(a) establishes four "safe harbors" that the Defendants can use to discharge their contractual duty of good faith when confronted with a conflict of interest.[28] Section 7.9(a) provides, in relevant part:

> Unless otherwise expressly provided ..., whenever a potential conflict of interest exists or arises between [Encore GP] or any of its Affiliates, on the one hand, and the Partnership, ... [or] any Partner ..., on the other, any resolution or course of action by [Encore GP] or its Affiliates in respect of such conflict of interest shall be permitted and deemed approved by all Partners, and shall not constitute a breach of this Agreement ... or of any duty stated or implied by law or equity, if the resolution or course

of action in respect of such conflict of interest is (i) approved by Special Approval, (ii) approved by the vote of a majority of the Common Units (excluding Common Units owned by [Encore GP] and its Affiliates), (iii) on terms no less favorable to the Partnership than those generally being provided to or available from unrelated third parties or (iv) fair and reasonable to the Partnership.... *If Special Approval is sought, then it shall be presumed that, in making its decision, the Conflicts Committee acted in good faith ...* [and] in any proceeding brought by any Limited Partner ... or the Partnership challenging such approval, *the Person bringing or prosecuting such proceeding shall have the burden of overcoming such presumption ....* [29]

The LPA defines "Special Approval" as "approval by a majority of the members of the Conflicts Committee acting in good faith." [30] Therefore, under Section 7.9(a), if the Conflicts Committee approves a transaction through the Special Approval process, the LPA deems the transaction approved and deems that Encore GP and its Affiliates did not breach their duties under the LPA, or any other duty they might owe. A plaintiff is free to argue that the Conflicts Committee did not approve a transaction in accordance with its contractual duty of good faith, meaning

---

**26.** *Compare Norton v. K–Sea Transp. P'rs L.P.*, 67 A.3d 354, 361 & n. 34 (Del.2013) (emphasis omitted) (citations omitted) (noting that the limited partnership agreement permitted the general partner to make any decision under the limited partnership agreement's authority "so long as such action is reasonably believed by [the general partner] to be in, or not inconsistent with, the best interests of the [p]artnership"), *with* App. to Opening Br. A84 (requiring only a "belie[f] that the determination or other action is in the best interests of the Partnership").

**27.** App. to Opening Br. A83 (emphasis added).

**28.** *K–Sea*, 67 A.3d at 364–65 (construing a similar provision as a permissive safe harbor).

**29.** App. to Opening Br. A83–84 (emphasis added).

**30.** *Id.* at A37. The LPA's definition of "good faith" in Section 7.9(b) applies "for purposes of [the LPA]," so "good faith" as used in the Special Approval definition means Section 7.9(b)'s contractual duty of good faith.

that the Conflicts Committee failed to grant "Special Approval." But, the plaintiff must rebut the presumption created by Section 7.9(a)—that the Conflicts Committee members acted in good faith when they approved the transaction.[31]

Notwithstanding this elaborate structure, Defendants suggest that Section 7.10(b) creates a more generally applicable conclusive presumption that they acted in good faith when they rely on a fairness opinion. Section 7.10(b) provides:

> [Encore GP] may consult with ... investment bankers ... selected by it, and any act taken or omitted to be taken in reliance upon the advice or opinion ... of such Persons as to matters that [Encore GP] reasonably believes to be within such Person's professional or expert competence shall be conclusively presumed to have been done or omitted in good faith and in accordance with such advice or opinion.[32]

This provision is substantively identical to the one we construed in *Gerber v. Enterprise Products Holdings, LLC.*[33] We interpreted this language in *Gerber* to entitle the general partner to a conclusive presumption that it had discharged its contractual duty of good faith if it took or failed to take action in reliance on the investment banker's opinion and "reasonably believe[d]" that rendering the opinion was within the investment banker's professional or expert competence.[34]

Allen argues that LPA Section 7.9(a)'s safe harbor creates only a *rebuttable* presumption of good faith when Encore resolves a conflict of interest. Therefore, he claims that Section 7.10(b)'s generally applicable *conclusive* presumption of good faith does not apply to conflict-of-interest transactions, which the specific safe harbor provision in Section 7.9(a) governs.[35] We need not reach this issue, however, if we

31. This provision differs from the limited partnership agreement we examined in *K–Sea*, which did not explicitly require the independent committee members to act in good faith when granting Special Approval and did not create a rebuttable presumption of good faith. *K–Sea*, 67 A.3d at 362–63; *but see Gerber v. EPE Hldgs., LLC*, 2013 WL 209658, at *7 (Del.Ch. Jan. 18, 2013) (concluding that a contractual duty of good faith might extend to an independent committee's actions when purporting to grant "Special Approval" notwithstanding the absence of an express "good faith" requirement).

32. App. to Opening Br. A85.

33. *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 418–21 (Del.2013) (holding that a limited partnership agreement created a conclusive presumption that a general partner had met its contractual duty to act in good faith, but clarifying that the provision did not bar a claim under the implied covenant of good faith and fair dealing); *see also K–Sea*, 67 A.3d at 367–68 (holding that an appropriate fairness opinion from an investment banker satisfied the general partner's "contractual

duty to exercise its discretion in 'good faith,' " as the limited partnership agreement defined the term).

34. *See Gerber*, 67 A.3d at 419 (construing a similar provision to entitle a general partner to a conclusive presumption that its contractual duty of good faith had been satisfied "if [it] rel[ies] upon the opinion of a qualified expert advisor"); *K–Sea*, 67 A.3d at 366–68 (holding that a general partner satisfied its contractual duty of good faith by relying on a fairness opinion from a competent expert). While *Gerber* and *K–Sea* used the words "qualified" and "competent" to describe the expert, the expert's competence is relevant only insofar as it allows the general partner to form a reasonable belief that the expert is qualified to render the opinion.

35. *See Brinckerhoff v. El Paso Pipeline GP Co.*, C.A. No. 7141, at 11, 20–21, 53–55 (Del. Ch. Oct. 26, 2012) (TRANSCRIPT) (concluding that a general conclusive presumption of good faith did not apply when a limited partnership agreement created a rebuttable presumption of good faith applicable to conflict transactions).

conclude that Allen has not pleaded facts indicating that the Defendants breached their contractual duty of good faith. Therefore we begin by inquiring whether Allen has pleaded facts that allow us reasonably to infer that Defendants breached their contractual duty.

### C. What is Required to Plead a Breach of the LPA's Contractual Duty of Good Faith?

 To determine whether Allen has pleaded that the Defendants breached the LPA's contractual duty of good faith, we must first analyze what standard the LPA imposes. We construe limited partnership agreements in accordance with their terms in order to give effect to the parties' intent.[36] When interpreting limited partnership agreements, we give words their plain meaning unless it appears that the parties intended a special meaning.[37] We construe limited partnership agreements as a whole and give effect to every provision if it is reasonably possible to do so.[38]

 The LPA's contractual duty requires a "belie[f]" that the determination or other action is in the best interests of the Partnership." Black's Law Dictionary

defines believe as "[t]o feel certain about the truth of; to accept as true," whereas it defines reasonably believe as "[t]o believe (a given fact or combination of facts) under circumstances in which a reasonable person would believe."[39] Some LPA provisions use "reasonably believes," while others use "believes," indicating that the parties intentionally distinguished between those two standards.[40] Therefore, we conclude that the Vice Chancellor correctly defined this LPA's contractual duty of good faith when he stated that "an act is in good faith if the actor subjectively believes that it is in the best interests of [Encore]."[41] This definition distinguishes between "reasonably believes" and "believes" and eschews an objective standard when interpreting the unqualified term "believes."

The Vice Chancellor further held that Allen must show that the Defendants "subjectively believed that they were acting against Encore's interests" to plead a breach of this contractual duty.[42] In other words, he held that a plaintiff must plead that a defendant acted in subjective bad faith in order to plead a breach of a subjective good faith standard. Allen argues

---

**36.** K–Sea, 67 A.3d at 360 (citing In re Nantucket Is. Assocs. Ltd. P'ship Unitholders Litig., 810 A.2d 351, 361 (Del.Ch.2002)).

**37.** See AT & T Corp. v. Lillis, 953 A.2d 241, 252 (Del.2008) (citing Lorillard Tobacco Co. v. Am. Legacy Found., 903 A.2d 728, 739 (Del. 2006)).

**38.** See GMG Capital Invs., LLC v. Athenian Venture P'rs I, L.P., 36 A.3d 776, 779 (Del. 2012) (citing E.I. du Pont de Nemours & Co. v. Shell Oil Co., 498 A.2d 1108, 1113 (Del. 1985)).

**39.** Black's Law Dictionary 175 (9th ed. 2009).

**40.** Compare App. to Opening Br. A85 (allowing Encore GP to rely on an expert's opinion so long as Encore GP "reasonably believes"

the underlying matter is within the expert's competence), with id. at A84 (establishing a contractual duty that Encore GP and its Affiliates "believe that [a] determination or other action is in the best interests of the Partnership").

**41.** In re Encore Energy P'rs LP Unitholder Litig., 2012 WL 3792997, at *9 (Del.Ch. Aug. 31, 2012) (citing In re Atlas Energy Res., LLC, 2010 WL 4273122, at *12 (Del.Ch. Oct. 28, 2010)); see also Crumplar v. Superior Court ex rel. New Castle Cnty., 56 A.3d 1000, 1005–06 (Del.2012) (noting that a subjective standard measures conduct against the actor's internal belief as opposed to objective criteria).

**42.** Encore Energy, 2012 WL 3792997, at *9 (citing Atlas Energy, 2010 WL 4273122, at *14).

that the Vice Chancellor treated subjective bad faith and subjective good faith as collectively exhaustive. That, he claims, is erroneous because it is possible for a person to breach a subjective good faith standard without subjectively believing that his actions are *against* the best interests of the partnership.

In *Lyondell Chemical Co. v. Ryan,* a corporate fiduciary duty case, we reaffirmed that "intentional dereliction of duty, a conscious disregard for one's responsibilities" is a type of conduct that lies between "subjective bad faith" and "gross negligence," and that it constituted "bad faith" under Delaware corporate fiduciary law.[43] Although any analogy between corporate fiduciary principles and alternative entity jurisprudence is necessarily imperfect, *Lyondell* illustrates a flaw in the Vice Chancellor's LPA interpretation. It is entirely possible that a defendant may not subjectively believe that an action is in a partnership's best interests (as the contractual duty of subjective good faith requires), but nonetheless does not subjectively believe that the action is *against* the partnership's best interests.[44] A person who "intentionally fails to act in the face of a known duty to act"[45] neither subjectively believes his decision is in the best interests of the partnership nor subjectively believes he is affirmatively acting against the best interests of the partnership.[46]

To fail intentionally to act in the face of a known duty, however, there must be a "duty." Here, the LPA replaced the common law fiduciary duties of loyalty and care with a contractual duty of subjective good faith. Therefore, the only duty the Conflicts Committee members had was to form a subjective belief that the Merger was in Encore's best interests. To plead a breach of the subjective good faith standard under a conscious disregard theory, Allen must show that the Conflicts Com-

---

**43.** *Lyondell Chem. Co. v. Ryan,* 970 A.2d 235, 240 (Del.2009) (quoting *In re Walt Disney Co. Deriv. Litig.,* 906 A.2d 27, 64–66 (Del.2006)).

**44.** At oral argument, Defendants contended that the Vice Chancellor arrived at his interpretation by reading the contractual duty of subjective good faith together with the LPA's exculpation provision, which exculpated Defendants from money damages subject to several exceptions, including if a court determined that they had acted in "bad faith." Tr. Oral Arg. at 27:15–30:20, *Allen v. Encore Energy P'rs L.P.,* No. 534, 2012 (Del. May 1, 2013), *available at* http://courts.delaware.gov/supreme/audioargs.stm. We note that the Vice Chancellor did not cite the LPA's exculpation provision in his analysis of the LPA's good faith standard. *See Encore Energy,* 2012 WL 3792997, at *9. Because we conclude *infra* that Allen has not pleaded that Defendants breached the LPA's contractual duty of subjective good faith, we do not reach the issue of whether the undefined term "bad faith" in the LPA's exculpation provision should encompass only *subjective* bad faith.

**45.** *Disney,* 906 A.2d at 67 (quoting *In re Walt Disney Co. Deriv. Litig.,* 907 A.2d 693, 755 (Del.Ch.2005)).

**46.** This conclusion does not alter the reasoning expressed in Court of Chancery decisions holding that there is no difference between "bad faith" and "a lack of good faith" in the context of the implied covenant of good faith and fair dealing. *See Amirsaleh v. Bd. of Trade of City of N.Y., Inc.,* 2009 WL 3756700, at *5 (Del.Ch. Nov. 9, 2009) (reasoning "that there is no meaningful difference between 'a lack of good faith' and 'bad faith' "); *Liberty Prop. Ltd. P'ship v. 25 Mass. Ave. Prop. LLC,* 2009 WL 224904, at *5 (Del.Ch. Jan. 22, 2009) (finding, under District of Columbia law, "no basis to innovate and articulate a doctrine of 'neutral faith' in which a contracting party has acted in a manner that, while not in bad faith, is also not in good faith"). We conclude only that, when a limited partnership agreement defines "good faith" as a subjective belief that an action is in the partnership's best interests, that standard excludes a broader range of mental states than a subjective belief that an action is *against* the partnership's best interests.

mittee consciously disregarded its contractual duty to form a subjective belief. It would take an extraordinary set of facts to do that.

■ We cannot accept Allen's invitation to import standards of conduct from corporate or tort law to govern the Conflicts Committee's negotiation process. The LPA explicitly provides that when the LPA requires Encore GP or its Affiliates to make a determination in "good faith," they "shall not be subject to any other or different standards imposed by [the LPA] ... or under the [DRULPA] or any other law, rule or regulation or at equity." [47] Furthermore, Section 7.9(b) and (e) together replace any common law fiduciary duties with a contractual duty of subjective good faith. Given this explicit language, it is clear that only the contractual duty, not contract or tort law standards, would govern the Conflicts Committee's action.

Therefore, to plead a breach of the LPA's contractual duty of subjective good faith, Allen must plead facts that enable a court reasonably to infer that the Conflicts Committee members did not subjectively believe that the Merger was in Encore's best interests. Allen can meet this standard by showing that the Conflicts Committee believed it was acting against Encore's best interests when approving the Merger. He can also do that by showing that the Conflicts Committee consciously disregarded its duty to form a subjective belief that the Merger was in Encore's best interests.

### D. Does the Complaint Plead Sufficient Facts to Permit an Inference That the Conflicts Committee Members Breached Their Contractual Duty of Subjective Good Faith?

■ If the Conflicts Committee members acted with subjective good faith when approving the Merger, their approval meets the LPA's definition of Special Approval and would compel a conclusion, by the operation of the LPA's plain terms, that no Defendant breached the LPA by consummating the Merger. Therefore, we next address whether the Complaint's allegations permit us to infer that the Conflicts Committee members breached their contractual duty of subjective good faith when approving the Merger. Only the Conflicts Committee members' (as opposed to all Defendants') subjective good faith is relevant to this determination.

We first must analyze how a plaintiff pleads a defendant's state of mind. We have recognized that "it may be virtually impossible for a ... plaintiff to sufficiently and adequately describe the defendant's state of mind at the pleadings stage." [48] Even after a trial, a judge may need to make credibility determinations about a defendant's subjective beliefs by weighing witness testimony against objective facts. Despite their expertise, the members of the Court of Chancery cannot peer into the "hearts and souls of directors" [49] to determine their subjective intent with certainty. For these reasons, the Vice Chancellor overstated [50] the potency of the sub-

47. App. to Opening Br. A84.

48. *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.,* 624 A.2d 1199, 1208 (Del.1993) (citations omitted).

49. *Prod. Res. Grp., L.L.C. v. NCT Grp., Inc.,* 863 A.2d 772, 800 n. 85 (Del.Ch.2004) (citations omitted).

50. The Vice Chancellor may have meant that a plaintiff must plead facts that allow us to infer that a decision maker actually *believed* that the transaction was against the partnership's best interests to establish subjective bad faith, not merely that a transaction's consideration fell outside of a range of fair values. His statement therefore might be inartful phrasing rather than a new legal standard.

jective good faith standard by concluding that the objective reasonableness of the Conflicts Committee's determination was "not relevant" to the LPA's subjective standard.[51] The Vice Chancellor's standard, if upheld, would render these transactions virtually unchallengeable.

Pleaded facts indicating only that a transaction's terms fell below an objective standard of reasonableness are logically relevant to analyzing whether a Defendant satisfied the LPA's subjective standard. But, they are neither necessary nor sufficient to justify a reasonable inference that the Conflicts Committee did not act with subjective good faith. Some actions may objectively be so egregiously unreasonable, however, that they "seem[ ] essentially inexplicable on any ground other than [subjective] bad faith."[52] It may also be reasonable to infer subjective bad faith in less egregious transactions when a plaintiff alleges objective facts indicating that a transaction was not in the best interests of the partnership and that the directors knew of those facts. Therefore, objective factors may inform an analysis of a defendant's subjective belief to the extent they bear on the defendant's credibility when asserting that belief.

 It is essential to ensure, however, that the subjective good faith standard remains distinct from an objective, "reasonable person" standard. Therefore, the ultimate inquiry must focus on the subjective belief of the specific directors accused of wrongful conduct. The directors' personal knowledge and experience will be relevant to a subjective good faith determination, which must focus on measuring the directors' approval of a transaction against their knowledge of the facts and circumstances surrounding the transaction. Trial judges should avoid replacing the actual directors with hypothetical reasonable people when making the inquiry. With that in mind, we turn to the Complaint's allegations.

The Complaint alleges that Vanguard's initial offer contained a negligible premium and that the Conflicts Committee's counteroffer was only 4% higher. It further alleges that, after accounting for a company-specific drop in Vanguard's unit price, the counteroffer represented a 9.1 % discount to Vanguard's initial offer. The counteroffer fell below the median of the various metrics used in Jefferies's fairness opinion and was below the bottom of Vanguard's advisor's valuation metric and the widely used standardized measure metric.

Allen does not contend that the Conflicts Committee members were conflicted, so their independence is unquestioned. The Complaint clearly alleges that the Conflicts Committee members began the process knowing that Vanguard had refused to consider selling Encore GP or the 46% of Encore's LP units it held, effectively foreclosing an auction process. The only reasonable inference is that the Conflicts

We address it, however, "because it could be misinterpreted in future cases as a correct rule of law." *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.,* 817 A.2d 160, 167 (Del. 2002).

51. *In re Encore Energy P'rs LP Unitholder Litig.,* 2012 WL 3792997, at *11 (Del.Ch. Aug. 31, 2012) (citing *In re Atlas Energy Res., LLC,* 2010 WL 4273122, at *12 (Del.Ch. Oct. 28, 2010)).

52. *Parnes v. Bally Entm't Corp.,* 722 A.2d 1243, 1246 (Del.1999) (quoting *In re J.P. Stevens & Co. S'holders Litig.,* 542 A.2d 770, 780–81 (Del.Ch.1988)) (concluding, in a corporate fiduciary duty case, that "[t]he presumptive validity of a business judgment is rebutted in those rare cases where the decision under attack is 'so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith' ").

Committee members knew they had limited negotiating leverage vis-à-vis Vanguard.

Viewed in this context, the Conflicts Committee's counteroffer, while providing only a meager increase in the exchange ratio and a discount from the initial offer, does not justify a reasonable inference that the Conflicts Committee members breached the LPA's contractual duty of subjective good faith. Although Allen attacks the Conflicts Committee's counteroffer as "indefensible," he ignores the Proxy Statement's disclosures that the Conflicts Committee based its counteroffer on its belief that Vanguard would not agree to an exchange ratio that would dilute its distributable cash flow per unit. The Proxy Statement indicates that a 1:0.75 exchange ratio approached the point where the Merger would dilute Vanguard's distributable cash flow per unit. The Conflicts Committee also believed that Encore's unit price already reflected a premium because the market anticipated a merger with Vanguard. Allen fails to allege that these facts were "not among the bases for the Conflicts Committee members' subjective belief that the Merger was in the Partnership's best interests."[53] Without more, showing that the Conflicts Committee members may have negotiated poorly does not permit a reasonable inference that they subjectively believed they were acting against Encore's best interests. As another Vice Chancellor has noted, "[w]hile allegations that the [Conflicts Committee]

failed ... to negotiate the best deal available might suffice to state a colorable claim for breach of the traditional fiduciary duties of care and loyalty," these allegations "do not suggest the type of subjective bad faith required to state a claim under the [LPA]."[54]

The allegations that the Conflicts Committee's counteroffer was below the median of Jefferies's analyses' ranges are similarly insufficient. Jefferies provided nine separate valuation metrics. The counteroffer fell within eight of them (and was above the remaining metric's range). While Allen argues that two alternative metrics are "industry-specific" and "widely used," he does not contend that Jefferies's valuation metrics were inappropriate. There is no allegation that the alternative metrics were so widely adopted in the industry that their absence would have been apparent to the Conflicts Committee members or that their absence rendered Jefferies's analyses fatally flawed.[55] Indeed, Allen conceded that the Conflicts Committee negotiated a Merger within a range of fair values.[56] Thus, the Conflicts Committee's decision was not so far beyond the bounds of reasonable judgment that one can infer subjective bad faith as the only explanation. Nor do they support a reasonable inference that the Conflicts Committee did not subjectively believe that the Merger was in Encore's best interests.

53. *Encore Energy*, 2012 WL 3792997, at *11.

54. *Atlas Energy*, 2010 WL 4273122, at *14.

55. *See Brinckerhoff v. Enbridge Energy Co.*, 2011 WL 4599654, at *10 (Del.Ch. Sept. 30, 2011) (noting that the "analyses that an investment banker undertakes ... are properly within the discretion of the investment banker"), *aff'd*, 67 A.3d 369 (Del.2013).

56. *Encore Energy*, 2012 WL 3792997, at *11 n. 70 ("Plaintiffs could have argued that the

price is unfair and Jefferies was incompetent and that there was no basis for relying on the Jefferies analysis. That's not at all what [p]laintiffs argue.... [T]he fact that where they ended up was within a range of fair value doesn't answer the proposition that they were ineffective and not-in-good-faith bargaining agents." (alterations in original) (citations omitted) (internal quotation marks omitted)).

Nor do the Complaint's allegations that the Merger closed at a discount to the original offer and led to initially lower distributions to the unitholders allow us to infer subjective bad faith. That the Merger closed at a discount may indicate that the Conflicts Committee should have negotiated price protection provisions, but poor transaction planning does not translate to subjective bad faith. The Proxy Statement indicates that the Conflicts Committee believed that the fixed exchange ratio gave Encore's unitholders upside potential if Vanguard's unit price climbed. Allen does not contend the Conflicts Committee did not subjectively believe this statement. Finally, although Encore unitholders would initially obtain lower distributions as Vanguard unitholders than they had received as Encore unitholders, that alone does not justify a reasonable inference that the Conflicts Committee did not subjectively believe the Merger provided a better long-term opportunity for Encore unitholders than remaining independent.

The Vice Chancellor noted that the Complaint alleges that the Conflicts Committee ran a "shoddy" negotiation with Vanguard and obtained a "[m]eager" exchange ratio improvement.[57] A shoddy negotiation that obtains a meager improvement, however, may still be conducted in subjective good faith. Allen entered into a limited partnership agreement that created a duty of subjective good faith. Therefore he has no contractual basis to argue that the LPA required the Conflicts Committee to bargain to his satisfaction or to achieve a better result. If Allen seeks the protections the common law duties of loyalty and care provide, he would be well-advised to invest in a Delaware corporation. He is bound by his decision to forgo

these protections. His allegations do not permit a reasonable inference that the Conflicts Committee members subjectively believed they were acting against Encore's interests when they gave the Merger Special Approval.

Nor does Allen's Complaint allege any facts from which we can reasonably infer that the Conflicts Committee members consciously disregarded their contractual duty. To plead adequately that the Conflicts Committee members failed to act in good faith under this theory, the Complaint must allege in a nonconclusory way that the Conflicts Committee members consciously disregarded their duty to believe subjectively that the Merger was in Encore's best interests. The Conflicts Committee members' conduct is relevant only if and to the extent it shows they failed to form a subjective belief that a transaction was in Encore's best interests. Here, the Complaint alleges that the Conflicts Committee members negotiated over several months, retained independent advisors, and refused to agree to the Merger until Vanguard increased the exchange ratio. Allegations that the Conflicts Committee should have started with a higher counteroffer, should have negotiated more forcefully, and should thereby have achieved a better result do not support a reasonable inference that the Conflicts Committee consciously disregarded a duty to *form a subjective belief* that a transaction was in Encore's best interests. Therefore, we hold that Allen has failed to plead facts that, if true, would establish that the Conflicts Committee members breached their contractual duty to act in subjective good faith when approving the Merger.[58] Therefore the Merger received

57. *Id.* at *11, *12.

58. Because we conclude that Allen has failed to state a claim that the Conflicts Committee members did not act in accordance with their contractual duty of good faith, we do not address whether a general partner may rely

valid Special Approval, the effect of which is next discussed.[59]

### E. What is the Effect of Special Approval on the Allegations that Vanguard Drove Down the Price of Encore's Units?

■ We now address the effect on Vanguard of the Conflicts Committee's valid Special Approval. Allen argues that Special Approval cannot insulate Vanguard from liability for causing Encore GP to issue allegedly value-depressing disclosures in the January and February Releases, or for increasing Encore's capital expenditures and correspondingly reducing distributions.

As the Vice Chancellor held, Allen's Complaint contains a *single* claim for relief—"Defendants breached their contractual duties to [Encore's unaffiliated unitholders] by proposing, approving and consummating a transaction that was not fair or reasonable and was undertaken in bad faith, and [Encore's unaffiliated unitholders] have suffered damages thereby."[60] It follows that Allen has alleged only one LPA breach—the Merger itself—not that the Merger and Vanguard's disclosures constituted independent LPA breaches.

Because Allen's only claim is that the Merger was unfair and undertaken in bad faith, Vanguard's allegedly value-depressing disclosures are relevant only insofar as they resulted in a unfair exchange ratio for the Merger itself. The Conflicts Committee gave Special Approval to the Merger.[61] Therefore, the "resolution or course of action by [Encore GP] or its Affiliates in respect of such conflict of interest shall be permitted and deemed approved by all [p]artners, and shall not constitute a breach of [the LPA]."[62] For that reason, the Conflicts Committee's grant of Special Approval requires us to conclude that Allen's allegations fail to state a claim against any Defendant.

## IV. CONCLUSION

For these reasons, we AFFIRM the Court of Chancery's dismissal of Allen's Complaint.

---

upon a *conclusive* presumption of good faith under Section 7.10(b)'s generally applicable terms when Section 7.9(a) establishes a system of *rebuttable* presumptions expressly applicable to conflict transactions. *See Brinckerhoff v. El Paso Pipeline GP Co.*, C.A. No. 7141 (Del. Ch. Oct. 26, 2012) (TRANSCRIPT).

59. As previously mentioned, the LPA permits Encore GP to resolve a conflict of interest by Special Approval, which the LPA defines as approval by a majority of the Conflicts Committee members acting in good faith. *See supra* text accompanying notes 28–31.

60. *Encore Energy*, 2012 WL 3792997, at *9 (citations omitted).

61. Allen alleges the Vice Chancellor erroneously construed the LPA to allow Special Approval to immunize bad-faith conduct that the Conflicts Committee did not know occurred. We do not reach this issue, because Allen conceded before the Vice Chancellor that the Conflicts Committee "was conscious of the value-depressive disclosures by Vanguard in the months leading up to the announcement of the offer." *Id.* at *5 & n. 20 (citations omitted) (internal quotation marks omitted).

62. App. to Opening Br. A83.