# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE: EL PASO PIPELINE PARTNERS, )       C.A. No. 7141-VCL
L.P. DERIVATIVE LITIGATION                )

## MEMORANDUM OPINION

Date Submitted: January 28, 2015
Date Decided: April 20, 2015

Jessica Zeldin, ROSENTHAL, MONHAIT & GODDESS, P.A., Wilmington, Delaware; Jeffrey H. Squire, Lawrence P. Eagel, David Stone, BRAGAR EAGEL & SQUIRE, PC, New York, New York; *Attorneys for Plaintiff*.

Peter J. Walsh, Jr., Brian C. Ralston, Berton W. Ashman, Jr., Matthew F. Davis, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; *Attorneys for Defendants El Paso Pipeline GP Company, L.L.C., El Paso Corporation, Douglas L. Foshee, John R. Sult, Ronald L. Kuehn, Jr., D. Mark Leland, Arthur C. Reichstetter, William A. Smith, and James C. Yardley*.

Lewis H. Lazarus, Thomas E. Hanson, Jr., Courtney R. Hamilton, Brett M. McCartney, MORRIS JAMES LLP, Wilmington, Delaware; *Attorneys for Nominal Defendant El Paso Pipeline Partners, L.P.*

**LASTER, Vice Chancellor.**

In 2010, El Paso Corporation ("Parent") sold two of its subsidiaries to El Paso Pipeline Partners, L.P. (the "Partnership" or "El Paso MLP"). At the time, Parent controlled El Paso MLP through its ownership of El Paso Pipeline GP Company, L.L.C., which served as the sole general partner of El Paso MLP (the "General Partner").

The first subsidiary was Southern LNG Company, L.L.C., which owned a liquefied natural gas ("LNG") terminal on Elba Island, Georgia. The second subsidiary was Elba Express, L.L.C., which owned a 190-mile natural gas pipeline that connected the Elba Island terminal to four major interstate natural gas pipelines. Parent treated the two entities as a single unit, so this decision refers to them jointly as "Elba."

In March 2010, Parent sold El Paso MLP a 51% interest in Elba. In November, Parent sold El Paso MLP the remaining 49% interest, plus a 15% interest in another Parent subsidiary. The other subsidiary was Southern Natural Gas, L.L.C. ("Southern"), which operated a 7,600-mile natural gas pipeline. In 2011, Parent sold El Paso MLP an additional 25% interest in Southern in a transaction that was the subject of separate litigation. *See Allen v. El Paso GP Co., LLC (El Paso I)*, 2014 WL 2819005 (Del. Ch. June 20, 2014) (granting summary judgment in favor of the defendants), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015) (ORDER).

In both the March and November transactions, ownership interests "dropped down" from Parent to El Paso MLP. Similar related-party transactions proliferate in the oil and gas industry, where professionals call them dropdowns. This decision refers to the March transaction as the "Spring Dropdown" and the November transaction as the "Fall Dropdown."

1

The plaintiff challenged both dropdowns. The limited partnership agreement governing El Paso MLP (the "LP Agreement" or "LPA") permitted the General Partner to cause El Paso MLP to engage in a transaction involving a conflict of interest, like the dropdowns, if the transaction received Special Approval, defined in the LP Agreement as approval from a Conflicts Committee (the "Committee") comprising qualified members of the board of directors of the General Partner (the "GP Board"). The only contractual requirement for Special Approval was that the Committee members believe in good faith that the transaction was in the best interests of El Paso MLP.

Applying this standard, the court granted the defendants' motion for summary judgment as to the Spring Dropdown. *See In re El Paso Pipeline P'rs, L.P. Deriv. Litig. (El Paso II)*, 2014 WL 2768782 (Del. Ch. June 12, 2014). The court partially denied the defendants' motion for summary judgment as to the Fall Dropdown, finding that "[q]uestions of fact exist[ed] requiring a trial as to the state of mind of the members of the Conflicts Committee" when approving the later transaction. *In re El Paso Pipeline P'rs L.P. Deriv. Litig.*, 2014 WL 2641304 (Del. Ch. June 12, 2014) (ORDER).

I expected that at trial, the Committee members and their financial advisor would provide a credible account of how they evaluated the Fall Dropdown, negotiated with Parent, and ultimately determined that the transaction was in the best interests of El Paso MLP. It turned out that in most instances, the Committee members and their financial advisor had no explanation for what they did. The few explanations they had were conclusory or contradicted by contemporaneous documents. Rather than evaluating what was in the best interest of El Paso MLP, the Committee members regarded as dispositive

2

whether the Fall Dropdown was accretive, in the sense of enabling El Paso MLP to increase distributions to holders of its common units. Accretion to common unitholders is a separate inquiry from whether a transaction is in the best interests of El Paso MLP. The evidence at trial ultimately convinced me that when approving the Fall Dropdown, the Committee members went against their better judgment and did what Parent wanted, assisted by a financial advisor that presented each dropdown in the best possible light, regardless of whether the depictions conflicted with the advisor's work on similar transactions or made sense as a matter of valuation theory.

This post-trial decision finds that the Committee members failed to form a subjective belief that the Fall Dropdown was in the best interests of El Paso MLP. The General Partner therefore breached the LP Agreement by causing El Paso MLP to engage in the Fall Dropdown. None of the other defendants were parties to the LP Agreement, and this court previously entered summary judgment in their favor on the claim of breach. In post-trial briefing, the plaintiff did not present its theories of secondary liability in any meaningful way, and they are deemed waived. The finding of breach therefore does not result in liability for any defendant other than the General Partner

The plaintiff's expert demonstrated at trial that El Paso MLP paid $171 million more for a 49% interest Elba than it would have if the General Partner had not breached the LP Agreement. The General Partner is liable for that amount, plus pre- and post-judgment interest at the legal rate, compounded quarterly, from the date the Fall Dropdown closed.

## I. FACTUAL BACKGROUND

The case was tried over three days. The burden of proof rested on the plaintiff. The following facts were proven by a preponderance of the evidence.

### A. The Parties

Parent was a Delaware corporation whose shares of common stock traded on the New York Stock Exchange under the symbol "EPC." Headquartered in Houston, Parent focused on the exploration, production, and transmission of natural gas. Parent's existence as a public company ceased when Kinder Morgan, Inc. acquired it in 2012.

El Paso MLP was a Delaware limited partnership controlled by Parent. El Paso MLP's limited partner interest was divided into common units that traded on the New York Stock Exchange under the symbol "EPB." After Kinder Morgan acquired Parent, the common units continued to trade until 2014, when El Paso MLP became a wholly owned subsidiary of Kinder Morgan.

In 2010, through the General Partner, Parent owned all of El Paso MLP's general partner interest, representing a 2% economic interest in El Paso MLP. Parent also owned approximately 52% of El Paso MLP's common units and all of its incentive distribution rights ("IDRs"). The IDRs were a class of non-voting units authorized by the LP Agreement that gave Parent a preferential claim to El Paso MLP's cash flows.

Parent exercised *de jure* control over El Paso MLP through the General Partner. Parent exercised *de facto* control over El Paso MLP because the Partnership had no employees of its own. Employees of Parent managed and operated its business.

The composition of the GP Board reflected Parent's control. In 2010, the members of the GP Board were defendants Douglas L. Foshee, D. Mark Leland, James C. Yardley, John R. Sult, Ronald L. Kuehn, William A. Smith, and Arthur C. Reichstetter. Foshee, Leland, Yardley, and Sult held senior management positions with Parent. Foshee was President and CEO of Parent. Leland was an Executive Vice President of Parent and President of its midstream group. Yardley was an Executive Vice President of Parent and President of its pipeline group. Sult was an Executive Vice President and the Chief Financial Officer of Parent. Each of the management directors beneficially owned equity stakes in Parent that dwarfed their equity stakes in El Paso MLP.

Additional positions held by Yardley and Sult reflected Parent's *de facto* control. Yardley was President and CEO of the General Partner. Sult was its CFO.

Three of the members of the GP Board—Kuehn, Smith, and Reichstetter—were outside directors. They met the independence standards for service on the audit committee of a NYSE-listed corporation, but they also had ties to Parent.

Kuehn spent his entire career with Parent or Sonat, Inc., a Fortune 500 energy company that Parent acquired in 1999. Kuehn served as Sonat's CEO from 1984 until the acquisition. Afterwards, Kuehn became the chairman of Parent's board of directors (the "Parent Board"). He served in that capacity from 1999 to 2001 and from 2002 until 2009. He served as Parent's interim CEO in 2003. Kuehn joined the GP Board in 2009, one year before the challenged dropdowns and the same year that he retired from the Parent Board. He owned roughly twice as much equity in Parent as in El Paso MLP.

Smith also had close ties to Parent. Like Kuehn, he spent the bulk of his career with Sonat, having worked there from 1970 until 1999. During that time, he spent eight years as an Executive Vice President and two years as General Counsel, both capacities in which he reported directly to Kuehn. After the acquisition, Smith continued with Parent until 2002. From 2003 until his retirement in 2011, Smith was a partner at a financial advisory boutique in Houston that specialized in the LNG space. He joined the GP Board in 2008, two years before the challenged dropdowns. Smith and his wife owned roughly equal amounts of equity in Parent and El Paso MLP.

Only Reichstetter had limited ties to Parent. He joined the GP Board in November 2007 after spending over thirty years in investment banking, primarily in the energy industry. He worked as a Managing Director at The First Boston Corporation, Dresdner Kleinwort Wasserstein, Merrill Lynch, and Lazard Frères. Approximately ten years before the dropdowns, he advised Parent about responding to a hostile proxy contest and helped Parent raise capital, neither of which gave me pause. Reichstetter held 107,347 El Paso MLP common units, which constituted a substantial part of his net worth. He did not own any Parent shares. At the time of the Fall Dropdown, Reichstetter's service on the GP Board was his only public company directorship.

B.    **A Pattern Of Dropdowns**

Parent created El Paso MLP to maximize the market value of its mid-stream assets and the amount of capital it could raise based on that valuation. Parent's mid-stream assets were governed by long-term capacity agreements that generated stable cash flows. Because it was a pass-through entity for tax purposes, El Paso MLP could distribute the

cash to investors in a tax-efficient manner. This built-in advantage meant that investors valued the same cash flows more highly at the MLP level than at the parent level, which enabled El Paso MLP to issue equity at a lower cost of capital than Parent could achieve. Through dropdowns, Parent took advantage of El Paso MLP's ability to raise tax-advantaged capital. By selling assets to El Paso MLP in return for cash it raised, Parent captured the tax benefit and obtained capital at the lowest possible cost.

When Parent created El Paso MLP, it contributed to El Paso MLP an initial set of mid-stream assets. Although the prospectus for the initial public offering stated that El Paso MLP could acquire assets from third parties and cautioned that Parent would not have any obligation to drop down additional assets, Parent was creating a sponsored entity, implying that Parent would sell assets to El Paso MLP over time. In fact, El Paso MLP only acquired assets from Parent. It never acquired assets from third parties.

The Fall Dropdown was the fifth post-IPO dropdown and the third in 2010. In order, the five dropdowns were:

| Date | Assets | Consideration |
|------|--------|---------------|
| 9/17/2008 | 30% of Colorado Interstate Gas Company ("Colorado Gas") and 15% of Southern | $967 million |
| 7/25/2009 | 8% of Colorado Gas | $278 million |
| 3/25/2010 | 51% of Elba | $963 million |
| 6/17/2010 | 16% of Southern | $540 million |
| 11/15/2010 | 49% of Elba and 15% of Southern | $1,412 million |

By 2012, when Kinder Morgan acquired Parent, El Paso MLP had completed nine dropdowns.

For each dropdown, Parent proposed to have El Paso MLP purchase specific assets. El Paso MLP never initiated a dropdown or specified the assets it wanted to

purchase. Each time, the assets consisted of a percentage interest in one or more Parent businesses. The consideration from El Paso MLP consisted of cash plus the assumption of a share of the entity's debt proportionate to the percentage of ownership being purchased. Sometimes El Paso MLP issued equity to Parent.

Each time, the GP Board proceeded by way of Special Approval. The LP Agreement authorized three other contractual routes: approval by the holders of common units unaffiliated with the General Partner, terms no less favorable to El Paso MLP than those generally provided by or available from unrelated third parties, or terms that were fair and reasonable to El Paso MLP. The GP Board never chose to proceed by an alternative contractual route, only by Special Approval.

At El Paso MLP, the Committee was not a standing committee of the GP Board, but rather an *ad hoc* committee constituted to consider specific transactions. For every dropdown, the Committee members were Kuehn, Smith, and Reichstetter. On each occasion, Reichstetter served as Chair and did all of the bargaining with Parent. Each time, the Committee obtained a marginal improvement in Parent's opening offer, then granted Special Approval.

On each occasion, the Committee hired Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") as its legal advisor and Tudor, Pickering, Holt & Co. ("Tudor") as its financial advisor. Tudor is a Houston-based boutique that specialized in the oil and gas industry. For the first dropdown, the Committee interviewed several legal and financial advisors before choosing Akin Gump and Tudor. After the first dropdown, the Committee hired Akin Gump and Tudor as a matter of course.

When the Committee hired Tudor for the first dropdown, the firm was just getting started in the advisory business. Since then, Tudor has built up its MLP practice to the point where it advises on approximately ten dropdowns per year. In 2010, Tudor's standard engagement letter called for a fee of $500,000 plus expenses, with the entire fee contingent on the issuance of a fairness opinion. For every one of the El Paso MLP dropdowns, the Committee hired Tudor on a fully contingent basis. Each time, Tudor opined that the resulting deal was fair and collected its $500,000 fee.

## C.     The Spring Dropdown Proposal

In February 2010, Parent proposed what would become the Spring Dropdown. Although *El Paso II* granted summary judgment in favor of the defendants on the Spring Dropdown, many of the plaintiff's attacks on the Fall Dropdown focus on inconsistencies in the Committee's treatment of the two transactions.

The idea for the Spring Dropdown originated with Yardley and Sult. In an internal presentation to the Parent Board, Parent management outlined the terms of the deal and its rationale. They proposed to have Parent sell 51% of Elba to El Paso MLP in return for $900 million in cash plus assumption of debt for total consideration of $1,053 million. The presentation explained that the transaction had been developed based on (i) the "[n]eed for capital at El Paso Corp.," (ii) a desire to show "support for El Paso Corp's pipeline business," and (iii) the goal of maintaining "a high performing MLP currency." JX 19 at 2. The presentation noted that the proposal was "considerably larger" than what had been contemplated by Parent's business plan, but that a larger transaction

"[m]aximizes cash proceeds to El Paso [Parent]." *Id.* at 3. The presentation stated that raising equity through El Paso MLP was Parent's "cheapest source of funds." *Id.* at 6.

Sult testified that when pricing the dropdowns, Parent always built in "some degree of cushion . . . that would give us the ability to negotiate with the [C]onflicts [C]ommittee." Sult 547.[1] The Parent management presentation noted that the purchase price implied a multiple of 11.0x Elba's EBITDA over the last twelve months ("LTM"). This was higher than recent market transactions, which implied "EBITDA multiples ranging from 8x – 10x," and a transaction by a peer company at "an 8.3x LTM EBITDA multiple." JX 19 at 5. The presentation also noted that because of Parent's ownership stake in El Paso MLP, Parent would receive back a majority of the cash flows that the assets would generate. Adjusted for the cash flows that Parent would receive, El Paso MLP would pay an effective multiple of 12.2x LTM EBITDA. *Id.* The "[p]remium over implied value" from the flow-back of cash was $236 million. JX 20 at 1.

Before making the proposal, Sult reached out to Akin Gump and Tudor. He let them know the proposal was coming, previewed its terms, and engaged them for the project. Sult contacted the advisors on other occasions as well. The Committee members did not know that Sult spoke privately with their advisors. *See* Reichstetter 42 ("I would be really surprised if [Sult] would have contacted the bankers unless we asked them to.").

---

[1] Citations in this form are to pages of the trial transcript. The name reflects the witness who was testifying.

After prepping the advisors, Sult had an informal call with Kuehn, Smith, and Reichstetter. During the call, Kuehn expressed concern about having El Paso MLP acquire a majority stake. Afterwards, Sult reduced the size of the proposal from 51% to 49%, and he lowered the proposed purchase price proportionately. On February 9, 2010, Parent formally proposed El Paso MLP acquire 49% of Elba for $865 million in cash plus assumption of debt.

## D.     The Gulf LNG Transaction

At the same time that Parent was proposing to sell LNG assets to El Paso MLP, the same management team was turning down an opportunity to buy LNG assets for Parent. Parent served as manager for Gulf LNG Clean Energy ("Gulf LNG"), which owned a LNG terminal in Mississippi. Like Elba, Gulf LNG's capacity had been pre-sold under a 20-year firm contract.

Parent held a 50% interest in Gulf LNG. The other 50% was split between Crest Financial Limited ("Crest"), with 30%, and Sonogol USA, a subsidiary of the state-owned oil company of Angola, with 20%. Parent had a right of first refusal on the minority interests.

In early February 2010, Parent learned that Crest was selling its interest to GE Energy Financial Services ("GE"). On February 9, the same day that Parent proposed the Spring Dropdown, a Parent employee sent Sult and Yardley an analysis of the Gulf LNG deal. It showed an implied multiple of 9.1x 2010 EBITDA. The indication of what a sophisticated arm's length purchaser would pay for LNG assets contrasted with Parent's higher proposal of 11x 2010 EBITDA.

11

After reviewing the analysis, Sult sent an email to Leland offering his blunt assessment of the Gulf LNG opportunity: "Not a pretty picture." Parent declined to exercise its right of first refusal. The sale to GE Energy closed on March 31, 2010.

**E.      The Committee's Work On The Spring Dropdown**

By unanimous written consent dated February 12, 2010, the GP Board reconstituted the Committee with Reichstetter, Kuehn, and Smith as its members. Tudor's engagement letter was dated the same day, before the Committee ever met.

On February 12, 2010, Sult reached out to Tudor again, this time to revisit whether the deal could involve 51% of Elba. Tudor agreed to support Sult's preference and told Reichstetter that there were "no accounting negatives as to consolidating 51%" and "a slight positive from a [u]nit holder's view point given the optics if [sic] control." JX 34. Reichstetter passed along this advice to Kuehn and Smith. On February 15, Sult revised the proposal to contemplate the terms that Parent originally wanted.

Before its first meeting with the Committee, Tudor met on February 19, 2010, with Sult and other representatives of Parent management. During the meeting, Parent management gave Tudor background information on Elba. The materials stressed that Elba's principal sources of revenue were long-term, fixed-fee contracts with subsidiaries of Royal Dutch Shell, plc ("Shell") and BG Group plc ("British Gas"). Under these contracts (the "Service Agreements"), the subsidiaries had reserved approximately 100% of Elba's capacity, guaranteeing that Shell and British Gas could transport or store gas at any time for a set charge. Because the Service Agreements were firm contracts, Elba

12

would charge fees to Shell and British Gas regardless of whether they actually stored or transported gas. The Service Agreements had terms of 25 to 30 years.

Less prominently, the materials noted that the counterparties were not Shell and British Gas themselves, but special purpose subsidiaries without assets of their own. The materials noted that the counterparties' obligations were covered by multi-year guarantees from other subsidiaries of Shell and British Gas that had Aa2/AA+ and A2/A credit ratings, respectively. The presentation also provided a chart that set forth the revenue that Elba would receive over the life of the Service Agreements and the amount guaranteed by the Shell and British Gas subsidiaries. The bottom line was that the guarantees covered less than 20% of the total.

The Committee members never understood until this litigation that the guarantees only covered less than 20% of the revenue from the Service Agreements. Until plaintiff's counsel demonstrated otherwise, the Committee members erroneously believed that the guarantees covered all or virtually all (more than 90%) of the revenue.

### 1. The February Meetings

The Committee met twice in February to consider the Spring Dropdown. Immediately after Tudor's due diligence session with Parent management, the Committee held its first meeting. Tudor described "the long term, demand-charge contracts backed by substantial guarantees from Shell and British Gas," and the Committee discussed "the firm, long-term, demand charge contracts, as well as the related credit analysis, including the substantial sponsor support from Shell and British Gas." JX 43.

The Committee met a second time on February 24, 2010. Tudor distributed a presentation that included a discounted cash flow ("DCF") analysis of Elba. It used a five-year projection period, exit multiples of 8x, 10x, and 12x, and discount rates of 8% to 13.9%. Parent's asking price fell just above the midpoint of the range, calculated as $812 million to $1,217 million.

Tudor also looked at selected transactions, which it divided into "Acquisition of Minority Interest (<50%)" and "Acquisition of Control (≥50%)." JX 47 at 37. The minority subset supported a range of 8.1x to 8.8x 2010 EBITDA, or $700 million to $757 million. The control subset supported a range of 6.8x to 13x 2010 EBITDA, or $589 million to $1,128 million. Tudor used the high multiple of 13x even though it was an outlier. Among the fifteen precedent control transactions, the next highest multiple was 10.3x, the median was 9.3x, and the mean was 9.2x.

Tudor's decision to split the precedent transactions into two groups was curious, because it did not match how Parent treated the transaction. Parent originally proposed to sell 51%—an "Acquisition of Control" in Tudor's parlance. After Sult's pre-proposal call with the Committee members, Sult backed the proposal down to 49%. He did not change the pricing significantly to reflect the lack of control. After Sult made a second private call to Tudor, when Tudor agreed to support a sale of 51%, Tudor did not tell Reichstetter that the change had pricing implications. Tudor told Reichstetter that it made no difference. Later, when analyzing the Fall Dropdown, Tudor would not draw any control-based distinction. Tudor split up the precedent transactions because it made Parent's asking price look better.

14

Tudor also looked at comparable companies. The peer company trading multiples implied a range of 11x to 14.6x 2010 EBITDA, or $994 million to $1,263 million. The same peer companies implied a multiple range of 11.2x to 14.2x 2011 EBITDA, or $1,023 million to $1,390 million. The asking price fell within both ranges.

Most importantly from the Committee's standpoint, Tudor's materials analyzed the potential accretion to the distributions that El Paso MLP would make on its common units. Tudor concluded that depending on the discount rate, El Paso MLP could increase distributions by 4.6% to 6.3%.

After reviewing Tudor's materials, Kuehn sent an email to his colleagues describing what he thought would be fair:

> Having gone over the Tudor Pickering material, where I come out is that given the obvious benefit to the sponsor in the form of increased distributions, the growth rate of the asset in question and the future benefit to both the sponsor and the public unit holders in terms of potential appreciation in distributions and market value, I come out that somewhere in the range if [sic] 8½ and 9 times EBITDA with no discount on the sponsor's units is in the ball park of fair value to all concerned parties. The info in paragraph 1 of Scott's 2/24 e-mail [which noted that Parent would receive an additional benefit from an increase in IDR payments as a result of the Spring Dropdown] may produce a different result, but lets [sic] see.

JX 57. Kuehn's range equated to a price of $725 million to $780 million, well below Parent's ask of $1,053 million. Moreover, Kuehn contemplated that the flow-back of cash to Parent, particularly if the transaction moved the IDRs into the high splits, should warrant a lower multiple.

### 2. The March 2 Meeting

During the Committee's third meeting, which took place on March 2, 2010, Tudor distributed a presentation that tracked the format of the previous book but added some pages to address questions raised by the Committee. One of the pages examined the flow-back of cash by calculating the transaction multiple from the point of view of Parent. From this standpoint, Tudor calculated that El Paso MLP would pay an effective multiple of 16.2x 2010 EBITDA and 14.3x 2011 EBITDA.

In the remaining pages, Tudor did not change any of its underlying analyses. Tudor did revise how it depicted the valuation information for the Committee on the summary page. For its precedent transaction analysis, Tudor continued to divide the transactions into a minority-interest subset and a control subset. Starting with the March 2 presentation, Tudor chose not to show the range for minority acquisitions.

After the meeting on March 2, 2010, Reichstetter consulted some analyst reports that anticipated Parent dropping down assets at a multiple of 9x 2010 EBITDA. He emailed the information to the Committee, observing that "[t]his gives us some comfort in our position that 9x or thereabouts is the right number and is consistent with investors' expectations." JX 61. The 9x multiple implied a value for Elba of $780 million.

### 3. Reichstetter Bargains With Sult.

Reichstetter next met with Sult. After discussing appropriate EBITDA multiples, Reichstetter suggested a price of $860-870 million. This figure departed sharply upward from what the Committee had discussed. It was $80 million higher than what Reichstetter envisioned in his email, and $90-$145 million higher than what Kuehn recommended. It

implied a multiple of 10.5x 2010 EBITDA, compared to the 9x that Reichstetter had identified and the range of 8.5x to 9x that Kuehn endorsed.

After his meeting with Reichstetter, Sult called Tudor to challenge the use of a 10x multiple. Tudor called Reichstetter, who responded to Sult with a conciliatory email:

> JR
>
> In order to put your mind at ease regarding any "multiples" discussed in our Tuesday meeting, you should understand that references to such were just that and only that . . . . they were certainly not determinants of value.
>
> Our determination of value itself was, as it should be and has been in prior drops, based upon fundamental business analysis, that which the prospective acquisition does or does not do businesswise or financially for [El Paso MLP], etc.; our concluding reference to enterprise value in the $860-$870 million range was so based.
>
> Best regards,
>
> Art

JX 63. Reichstetter had no explanation for this exchange at trial.

The next day, Sult countered at total consideration of $978 million. After some limited back and forth, Reichstetter and Sult agreed on $963 million. The price implied a multiple of 11.2x 2010 EBITDA.

### 4. The Committee Approves The Spring Dropdown.

After Reichstetter and Sult reached agreement, the Committee met twice more. On March 17, 2010, there was a brief meeting for an update on the deal's status. On March 24, the Committee held its final meeting. Tudor presented a substantively identical version of its book and opined that the Spring Dropdown was fair, from a financial point

of view, to the holders of common units other than the General Partner and its affiliates. The Committee gave its approval, and the Spring Dropdown closed shortly thereafter.

## F.    Developments After The Spring Dropdown

The market responded negatively to the Spring Dropdown. El Paso MLP's common units traded down 3.6% on the news, compared to a drop in the peer index of 0.7% and a decline in the S&P 500 of 0.2%. Kuehn wrote to his colleagues, "I thought we did a very good deal yesterday but apparently the market's expectations exceeded the realities. The next time we will have to negotiate harder." JX 76.

Shortly after the Spring Dropdown closed, Cheniere Energy, Inc. sold its 30% interest in Freeport LNG Development L.P. ("Freeport LNG") to Zachary American Infrastructure, LLC for $104 million. Freeport LNG owned an LNG terminal in Louisiana. Unlike Elba, the Freeport LNG terminal was under construction. Like Elba, its capacity had been pre-sold under a long-term contract.

## G.    The Summer Dropdown

In May 2010, Parent proposed another dropdown, this time involving a 16% interest in Southern. The transaction closed in June 2010, so this decision refers to it as the "Summer Dropdown." The plaintiff did not challenge the Summer Dropdown, but used it for comparison with the Fall Dropdown.

In the summer, Parent proposed to sell a 16% interest in Southern to El Paso MLP for $413 million in cash plus assumption of debt, representing total consideration of $559 million. The GP Board reconstituted the Committee with Reichstetter, Kuehn, and Smith

18

as its members. Reichstetter served as Chair. Akin Gump acted as counsel. Tudor acted as the financial advisor.

On June 4, 2010, the Committee held its first meeting. Tudor gave a presentation that closely resembled its presentations in the spring. The assumptions and inputs for the DCF methodology were the same. The precedent transaction analysis similarly looked the same, in that Tudor again broke the transactions into two groups: "Acquisition of Minority Interest (≤50%)" and "Acquisition of Control (>50%)." JX 86 at 23. *But this time Tudor flipped the group to which it assigned 50% acquisitions.* In the spring, Tudor defined control as a 50%-or-greater interest. In the summer, Tudor defined control as a greater-than-50% interest. Tudor made this change because in March 2010, Regency Energy Partners acquired a 50% interest in Midcontinental Express at a multiple of 11.6x 2010 EBITDA. Without re-defining what constituted a non-control transaction, the range for that group would have been 8.1x to 8.8x. At a multiple of 9.5x 2010 EBITDA, the Summer Dropdown was above that range. With this subtle shift, Tudor moved the Midcontinental transaction to the non-control side, increased the non-control range to 8.1x to 11.6x, and brought the Summer Dropdown within it.

The list of control transactions remained the same as in the spring, except that Tudor added the Spring Dropdown. This group of precedent transactions supported transaction multiples of 6.8x to 13x. The high multiple of 13x remained an outlier.

With the sets re-defined, the consideration fell within both ranges. As Tudor presented it, the Summer Dropdown was a non-control transaction. To be consistent with its approach to the Spring Dropdown, Tudor should have omitted the range for control

transactions. But Tudor was not interested in being consistent. For the Spring Dropdown, the price fell above the omitted range, so omitting that range made the deal look better. The Summer Dropdown did not present that problem, and Tudor showed both ranges. Later, in its final book for the Spring Dropdown, Tudor combined the two sets. With the deal falling within both ranges, there was no cosmetic advantage to breaking them out.

As in the spring, Tudor analyzed whether the Summer Dropdown would be accretive to distributions on the common units. Depending on the discount rate, Tudor calculated that El Paso MLP could increase distributions by 0.3% to 2.7%.

The Committee approved the Summer Dropdown on the terms proposed by Parent. Afterwards, Kuehn began anticipating the next dropdown. On September 2, 2010, he emailed Reichstetter and suggested that the next deal not involve more of Elba.

> Following up on our conversation of yesterday regarding the assets that might possibly be involved in the next drop down, I don't know whether you are planning to talk to JR [Sult] soon but it seems to me after thinking about it some that it is really not in the best interests of [El Paso MLP] to have too much of its assets tied up in the LNG trade. Given that [El Paso MLP] now owns a majority stake in [Colorado Gas] as well as Elba, it might make sense just to take on more of an interest in [Southern] so that the three principal assets are all majority owned by [El Paso MLP]. Just food for thought.

JX 90. Reichstetter responded, "It is as though you are reading my mind." *Id.* Despite not wanting more of Elba, just one month later, the Committee would approve the Fall Dropdown, in which El Paso MLP acquired the rest of that asset.

## H.     The Fall Dropdown Proposal

In October 2010, Parent proposed what would become the Fall Dropdown. Contrary to Reichstetter and Kuhn's preference for non-LNG assets, Sult decided that El

20

Paso MLP should acquire the rest of Elba. Parent proposed that El Paso MLP pay $806 million in cash plus assumption of debt for total consideration of $948 million. Sult included in the proposal an option for El Paso MLP to purchase an additional 13% of Southern for $325 million in cash plus assumption of debt, but only if El Paso MLP could raise the purchase price with equity. Sult included a second option to acquire an additional 2% of Southern for another $50 million in cash plus assumption of debt, but again only if El Paso MLP could raise the additional funds with equity. The inclusion of the options showed that Parent's principal interest was obtaining low-cost capital. Parent only wanted to sell more of Southern if El Paso MLP could raise the funds with tax-advantaged equity.

In a presentation to the Parent Board, Parent management described a key "sizing consideration" as "[m]aximiz[ing] cash proceeds to [Parent]." JX 94 at EP144214. The presentation noted that the Fall Dropdown "raise[d] equity [for Parent] at the lowest [cost] source of funds." JX 94 at EP144217. It also helped the General Partner move closer to the highest range of preferential distributions on the IDRs, which management projected could happen as early as the first quarter of 2011 if the Fall Dropdown closed.

In addressing valuation, Parent management calculated an implied multiple for Elba of 10x 2010 EBITDA. The presentation recognized that because of Parent's ownership stake in El Paso MLP and the resulting flow-back of cash, the effective multiple that El Paso MLP would pay was 11.2x 2010 EBITDA. The presentation provided the following context:

21

- Recent market transactions imply EBITDA multiples ranging from 8x-10x

  ◦ [Elba] recommended at 10x EBITDA due to contract length, lower leverage, fixed cash flow stream and low maintenance capex profile

  ◦ Williams transaction equated to a low 8x LTM EBITDA multiple

  ◦ Midcontinent Express pipeline sale at 10x EBITDA multiple

*Id.* at EP144215. In a supporting memorandum, Parent management noted that the pricing was "consistent with" the Spring Dropdown. JX 95 at 1. The asking price was actually higher on a percentage basis and as a multiple of EBITDA, even though the LNG market had deteriorated in the interim.

The presentation for the Parent Board addressed Southern separately from Elba. This was logical, since Parent was selling two different assets. This fact becomes important later because it contrasts with the Committee's decision to evaluate Parent's final offer as a unitary transaction, without examining the components separately.

I.     **The Committee's Work On The Fall Dropdown**

Parent formally extended its offer to El Paso MLP by letter dated October 8, 2010. On October 11, Reichstetter told Tudor to anticipate Committee meetings on October 15, on either October 18 or 21, and again on October 26, with a mid-November meeting for approval. The transaction unfolded almost exactly on that schedule.

Reichstetter asked Tudor to consider whether the weakening LNG market had undermined Elba's attractiveness and to examine recent LNG transactions, such as the Gulf LNG and Freeport LNG transactions. He followed up with an email:

Please perform analyses on EACH of the assets INDIVIDUALLY as well as combined.

Also consider presenting a new Comparable Acquisition category consisting of just the 3 recent LNG asset deals….very small sample but likely worth the look. Also, worth looking at the public market performance since our March deal for any publicly traded LNG businesses.

JX 102.

Internally, Tudor viewed the Fall Dropdown as little more than an update of its work on the Spring Dropdown. Tudor chose the code name "Encore," which one of its partners remarked was "more tactful than 'Again?'" JX 114.

On October 14, 2010, the GP Board acted by written consent to reconstitute the Committee. On October 15, Tudor met with Parent's management team about the transaction. Tudor's notes from the meeting reflect the following questions:

- Risks to [Elba] forecasts; risks to [Southern] forecast.

- Current view of LNG market; changes to competitive landscape

- Changes to relationship w[ith] BG or Shell; changes to guarantees; rates

JX 103. Parent management told Tudor that there were no changes and no risks.

### 1. The First Two Meetings

By custom, the Committee held its first meeting immediately after Tudor's session with Parent management. Tudor relayed what Parent management had said. After the meeting, two of Tudor's analysts searched for information about the Freeport LNG and Gulf LNG deals. One analyst found the press release for the Freeport LNG sale. Another analyst discovered and informed the leader of the Tudor team that "[Parent] was Crest's partner in the Gulf LNG project." JX 109. Kuehn and Smith knew this already.

23

The Committee next met on October 21, 2010. Tudor distributed a presentation that looked like the books from the Spring Dropdown, but there were differences.

First, during the previous meeting, the Committee tasked Tudor with re-examining the Service Agreements and the guarantees. Tudor included a slide prepared for the Spring Dropdown, but modified it to provide *less information* to the Committee:

| Figure 1 | Figure 2 |
|---|---|
| **March 24, 2010 TPH "Banker's Book"** | **October 21, 2010 TPH "Banker's Book"** |

**Elba Island** (Figure 1)

- The Service Agreements are between SLNG and each of BG LNG Services, LLC ("BG LNG") and Shell North America LNG, LLC ("SNALNG")
- The obligations of BG LNG and SNALNG under the Service Agreements are covered by multi-year guarantees from BG Energy Holdings Limited (A2/A) and Shell Oil Company (Aa2/AA-), respectively
- The aggregate guarantees for Phases I, II and IIIA provide significant coverage of projected annual demand revenue

| Year | Total Demand Revenue | Total Guaranteed Amount | Guaranteed % of Total Remaining Contract |
|---|---|---|---|
| 2010 | $139 | $642 | 16% |
| 2011-2012 | 170 | 626 | 17% |
| 2013 | 170 | 532 | 15% |
| 2014-2016 | 166 | 522 | 16% |
| 2017-2026 | 166 | 432 | 16% |
| 2027 | 142 | 432 | 39% |
| 2028-2034 | 130 | 163 | 17% |
| 2035 | 55 | 88 | 150% |
| 2036 | 3 | 73 | Nm |

JX 74 at 16.

**Elba Island** (Figure 2)

- The Service Agreements are between SLNG and each of BG LNG Services, LLC ("BG LNG") and Shell North America LNG, LLC ("SNALNG")
- The obligations of BG LNG and SNALNG under the Service Agreements are covered by multi-year guarantees from BG Energy Holdings Limited (A2/A) and Shell Oil Company (Aa2/AA+), respectively
- The aggregate guarantees for Phases I, II and IIIA provide significant coverage of projected annual demand revenue

| Year | Total Demand Revenue | Total Guaranteed Amount |
|---|---|---|
| 2010 | $139 | $642 |
| 2011-2012 | 170 | 626 |
| 2013 | 170 | 532 |
| 2014-2016 | 166 | 522 |
| 2017-2026 | 166 | 432 |
| 2027 | 142 | 432 |
| 2028-2034 | 130 | 163 |
| 2035 | 55 | 88 |
| 2036 | 3 | 73 |

JX 111 at 14.

In both charts, "Total Demand Revenue" was misleading. It was not the total revenue over the remaining life of the Service Agreements. It was the "total" projected revenue for a given identified contract year, *e.g.*, for 2010 or for each year from 2014 to 2016. The "Total Guaranteed Amount," by contrast, was the total coverage for all future years. By using different measuring periods and describing both as "totals," the charts made it

appear that the guaranteed amount always exceeded the revenue remaining over the life of the Service Agreements. The March version partially corrected this misimpression by providing the "Guaranteed % of Total Remaining Contract." In October, Tudor eliminated that column.

Second, Tudor played with its precedent transaction methodology. For the Spring Dropdown, Tudor had divided the precedent transactions into minority acquisitions and control acquisitions. The Spring Dropdown was an acquisition of 51%, and Tudor only showed the range for control transactions. To be consistent, Tudor should have used the same two groups for the Fall Dropdown and only presented the range for non-control transactions. Instead, Tudor went with a single range of precedent transactions. JX 111 at 39. This approach enabled Tudor to derive transaction multiple ranges of (i) 6.5x to 13.5x 2010 EBITDA and (ii) 6.8x to 13.0x 2011 EBITDA. Parent's asking price fell within these ranges.

Third, Tudor played with its DCF methodology. For the Spring Dropdown, Tudor used a single cash-flow projection period, calculated terminal value using exit multiples of 8x, 10x, and 12x, and applied a range of discount rates from 8% to 13.9%. For the Summer Dropdown, Tudor used a single cash-flow projection period, calculated terminal value using exit multiples of 8x, 10x, and 12x, and applied a range of discount rates from 8% to 14.5%. For the Fall Dropdown, Tudor prepared three different DCF valuations, one with a five-year projection period, another with a ten-year projection period, and a third with a fifteen-year projection period. Tudor chose to calculate terminal value using four exit multiples, rather than three, adding 6x to the mix. Most significantly, Tudor cut

25

off the upper bound of its discount rate at 12%. These changes widened the DCF range, increased the upper bound, and moved Parent's price towards the center.

Finally, Tudor played with its valuation summary. On a page addressing Southern, where Parent was asking for the lowest multiple, Tudor provided bars for all of three of its methodologies. Tudor did the same on a page addressing both Southern and Elba together, where the lower multiple for Southern drove down the multiple that Parent was asking for the transaction as a whole. But on the page that addressed Elba by itself, *Tudor only presented bars for its various DCF analyses and did not show its precedent transaction or comparable company analyses.*

The unifying theme for these changes was making Parent's asking price look better. Tudor did not identify any of these changes for the Committee, and the Committee members did not notice them. They did not learn of the changes until this litigation.

The next day, Kuehn shared his thoughts on the Fall Dropdown by email. The upshot was that he did not like having El Paso MLP acquire the balance of Elba, and he thought the price was too high. He provided the following reasons:

- LNG outlook negative near-medium term

- $3-$4 spread between Henry Hub & UK forward strip

- LNG facilities basically mature with little/no growth

- Essentially buying contracts/guarantees which are ok short/medium term but not thereafter

- LNG would account for a disproportionate share of [MLP] EBITDA (30%)

- Market perception more negative than in 3/10 [at the time of the Spring Dropdown] given recent announcements e.g. Cheniere [one of the LNG comparables]

- Therefore 3/10 enterprise price of $948 million seems high given above and related factors

- Committee feels $900 million more appropriate which is 9.3x 2011 and 9.6x 2012 EBITDA if transaction involves only Elba/ElbaX

JX 112.

Kuehn continued by explaining that several of these objections would be mitigated if Parent included Southern in the transaction, rather than as an option conditioned on a successful equity offering. In Kuehn's view, the mitigating factors included:

- LNG's contribution to EBITDA would be reduced (27%) which lessens drag on growth, possible negative market perceptions and somewhat mitigates future contractual risks

- Traditional pipes would account for 73% of EBTIDA with [Southern] at 32% with significantly greater growth prospects.

*Id.*

Kuehn recommended that El Paso MLP pay $1,131 million plus assumption of debt in return for the balance of Elba plus 15% of Southern, which would be included "without conditions or contingencies." *Id.* He explained:

This proposal would achieve [Parent's] objective; give [El Paso MLP] better balance re EBITDA contributions with greater growth potential—remove uncertain[t]y of the conditional nature of [Parent's] offer; and result in total acquisition price which the Committee believes reflects and will be perceived as fair value given the current environment.

*Id.*

27

## 2.   The October 26 Meeting

On October 26, 2010, the Committee held its third meeting. Tudor provided a presentation substantially identical in format to its October 21 presentation, but with some additional modifications. Most notably, Tudor changed the exit multiples it used in its DCF analysis. For the Spring Dropdown and Summer Dropdown, Tudor used exit multiples of 8x, 10x, and 12x. In its October 21 presentation, Tudor reduced the lower bound of the DCF range by including a 6x multiple. For the October 26 presentation, Tudor used exit multiples of 8x, 9x and 10x. This change brought the transaction price closer to the center of the DCF sensitivity. Tudor again did not identify the change for the Committee. The Committee members again did not notice the change.

Like the October 21 presentation, the October 26 presentation only provided a summary page containing the ranges for all of the valuation methodologies when addressing Southern alone or Southern and Elba together. When presenting valuation ranges for Elba, Tudor only presented bars for its assorted DCF analyses.

## 3.   Reichstetter Bargains With Sult, Who Restructures The Deal.

After the meeting on October 26, 2010, Reichstetter met with Sult to discuss price. Reichstetter asked for a reduction of $48 million, or 3%, resulting in a price of $900 million. Sult quickly agreed. There are no indications in the record that Reichstetter made the types of arguments that one would expect a motivated bargainer to make. He did not compare the asking price to the Spring Dropdown or point out that Tudor previously had justified a higher price based on the acquisition of 51%. He did not cite the deterioration of the LNG market. He did not mention Kuehn's objections to the transaction.

After the agreement on price, Sult came back to Reichstetter on November 8, 2010, and proposed changing the deal. Sult now suggested revising the Southern portion of the transaction to eliminate the option, make Southern part of the deal, and increase the amount acquired to the full 15%. Although Sult claimed to have come up with this himself, it was exactly what Kuehn had suggested "would achieve [Parent's] objective" and result in a total acquisition price that "will be perceived as fair value given the current environment." JX 112.

### 4. The November Meetings

The Committee quickly met two times in three days to consider and approve the revised deal. On November 10, 2010, the Committee received a presentation from Tudor that valued Elba and Southern as a package. Parent always valued the assets separately. Tudor previously had valued the assets separately. Reichstetter had told Tudor to value the assets separately. This time, Tudor removed the separate analyses. Tudor supposedly did so because, in Tudor's judgment, the separate analyses were "not core" to its opinion. JX 113; *see also* Simmons 668-74. Tudor also played with its DCF methodology, this time going back to a single five-year projection.

On November 12, 2010, the Committee had its final meeting. Tudor provided a presentation that was substantively identical to its November 10 presentation. Towards the end of the meeting, Tudor opined that the Fall Dropdown was fair from a financial point of view to the holders of the common units other than the General Partner and its affiliates. Tudor only opined on the combined transaction, not its component parts. The Committee voted in favor of the Fall Dropdown.

The Committee members never learned what the breakdown in price was between Elba and Southern. During their depositions and at trial, Reichstetter and Smith still had no idea what price El Paso MLP paid for the balance of Elba or how it compared to the Spring Dropdown. They likewise had no idea what price El Paso MLP paid for the additional 15% of Southern or how it compared to the Summer Dropdown. Reichstetter 79; Smith 366, 388. Kuehn believed El Paso MLP had paid the same price for Elba on a percentage basis, resulting in a price for that asset of approximately $925 million, but did not know for sure. Kuehn 461. Sult also believed that the Fall Dropdown was "priced . . . based on the valuation of the [S]pring [D]rop-[D]own." Sult 553.

Parent announced the Fall Dropdown on November 15, 2010. It closed shortly thereafter. Neither El Paso MLP nor Parent ever announced the price breakdown, only an aggregate price. Parent made the decision to present the Fall Dropdown as a unitary transaction. Sult 606. The Committee members understood that aggregating the price helped Parent and was done for cosmetic reasons.

Despite never presenting separate analyses of Southern and Elba to the Committee for purposes of the revised transaction, Tudor did the work internally. Tudor's analyses indicated that at best, El Paso MLP paid the same price on a percentage basis for Elba in the Fall Dropdown that it paid in the Spring Dropdown. Using the most conservative sensitivities possible (a discount rate of 8% and a terminal value of 10x EBITDA), Tudor's internal model resulted in Elba accounting for 65.9% of the total purchase price. Consequently, the purchase price for Elba was *at least* $931 million (65% of $1.412

billion), roughly consistent with Kuehn's recollection of $925 million. If Elba was valued using Tudor's mid-point assumptions, the price El Paso MLP paid would increase.

Notably, the price of at least $931 million that El Paso MLP paid was *more* than the $900 million that Sult and Reichstetter agreed on. The Committee sought and obtained the reduction from $948 million to $900 million because Kuehn thought the Spring Dropdown price was too high. Then when Parent changed the deal, the price went back up to the level of the Spring Dropdown. The Committee members never figured that out, because they went along with Parent's desire to present the deal as a unitary whole.

## J.    This Litigation

On December 22, 2011, the plaintiff filed a lawsuit challenging the Spring Dropdown. On March 6, 2012, the plaintiff filed a lawsuit challenging the Fall Dropdown. The two actions were consolidated.

### 1.    The Motion To Dismiss

Before the second complaint was filed, the defendants moved to dismiss. In a bench ruling, the court dismissed the plaintiff's claim for unjust enrichment. The court also held that the complaint did "not plead facts which suggest that any member of the [Conflicts Committee] was disqualified." *Brinckerhoff v. El Paso Pipeline GP Co.*, C.A. No. 7141-CS, at 52 (Del. Ch. Oct. 26, 2012) (TRANSCRIPT). The parties treated these rulings as applicable to the Fall Dropdown, and they are law of the case.

### 2.    The Motion for Summary Judgment

After the close of discovery, the defendants moved for summary judgment. In *El Paso II*, the court granted the defendants' motion as to the Spring Dropdown. Notably,

31

one aspect of that decision was premised on the plaintiff's argument that the Committee members did not know about the Gulf LNG sale when approving the Spring Dropdown. The evidence at trial demonstrated that Kuehn and Smith knew. The plaintiff has not sought to revisit that aspect of *El Paso II*, which is law of the case.

The court partially denied the defendants' motion as to the Fall Dropdown:

> Questions of fact exist requiring a trial as to the state of mind of the members of the Conflicts Committee. The evidence supports an inference that at the time they approved the Fall Drop–Down, the members of the Conflicts Committee and their advisors knew of recent transactions in the LNG space at materially lower multiples than the Fall Drop–Down. Questions of fact exist as to the comparability of those transactions, and the evidence does not permit a determination at the summary judgment stage that the transactions were not comparable. Questions of fact also exist as to why the Conflicts Committee and their advisors valued the Fall Drop–Down, which involved an acquisition of a minority stake, using the same valuation analysis that was used for the Spring Drop–Down, which involved a controlling stake and was valued expressly on that basis. Viewed in the light most favorable to the plaintiffs, the evidence could support an inference that the members of the Conflicts Committee and their advisors consciously ignored the comparable transactions and the differences between the Drop–Down Transactions with the bad faith intent of approving a transaction that would provide excessive value to the General Partner. This is not the only possible inference, nor even necessarily the strongest inference, but it is an inference to which the plaintiffs are entitled on summary judgment.

*In re El Paso Pipeline P'rs L.P. Deriv. Litig.*, 2014 WL 2641304 (Del. Ch. June 12, 2014) (ORDER).

## II.      LEGAL ANALYSIS

The plaintiff sought to prove at trial that the General Partner breached Section 7.9(a) of the LP Agreement. The plaintiff sought to impose secondary liability on the other defendants under theories of aiding and abetting a breach of contract and tortious

interference with contract. During post-trial briefing, the plaintiff did not devote meaningful effort to presenting the claims for secondary liability, which were waived. As to the sole remaining claim, this decision holds that the General Partner breached Section 7.9(a) of the LP Agreement.

For reasons explained in *El Paso I* and *El Paso II*, Section 7.9(a) required that the Committee members believe subjectively that the Fall Dropdown was in the best interests of El Paso MLP. The contractual standard did not require that the Committee make a determination about the best interests of the common unitholders as a class or prioritize their interests over other constituencies.[2] The contractual standard also did not contemplate that a court would review the Committee's decision using an objective test, such as reasonableness.[3]

For purposes of trial, the contractual standard meant that the plaintiff bore the burden of proving by a preponderance of the evidence that the Committee members did

---

[2] *See El Paso II*, 2014 WL 2819005, at *8-9 (analyzing and applying contractual language); *Sonet v. Timber Co.*, 722 A.2d 319, 325 (Del. Ch. 1998) ("In any event, pursuant to § 6(b) of the agreement, in situations where the General Partner is authorized to act according to its own discretion, there is no requirement that the General Partner consider the interests of the limited partners in resolution of a conflict of interest.").

[3] *See El Paso II*, 2014 WL 2819005, at *8-9 (analyzing and applying contractual language); *cf. Norton v K-Sea Trans. P'rs, L.P.*, 67 A.3d 354, 361 (Del. 2013) (interpreting a provision permitting a general partner to act "so long as such action is reasonably believed by [the general partner] to be in, or not inconsistent with, the best interests of the [p]artnership").

not hold the necessary subjective belief.[4] "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not." *Agilent Techs, Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010) (Strine, V.C.) (internal quotation marks omitted). "Under this standard, [the plaintiff] is not required to prove its claims by clear and convincing evidence or to exacting certainty. Rather, [the plaintiff] must prove only that it is more likely than not that it is entitled to relief." *Triton Const. Co. v. E. Shore Elec. Servs.*, 2009 WL 1387115, at *6 (Del. Ch. May 18, 2009), *aff'd*, 988 A.2d 938 (Del. 2010) (TABLE).

One way that the plaintiff could make the necessary showing was through persuasive evidence that the Committee members subjectively intended to act "against [the Partnership's] best interests" when approving the transaction. *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 106 (Del. 2013). This type of conduct involves "subjective bad faith," or conduct "motivated by an actual intent to do harm." *In re Walt Disney Co.*

---

[4] *See* LPA § 7.9(a) (placing the burden of proof on the plaintiff to overcome a presumption of good faith); *Estate of Osborn ex rel. Osborn v. Kemp*, 2009 WL 2586783, at *4 (Del. Ch. Aug. 20, 2009) ("Typically, in a post-trial opinion, the court evaluates the parties' claims using a preponderance of the evidence standard."), *aff'd*, 991 A.2d 1153 (Del. 2010); *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 834 n.112 (Del. Ch. 2007) ("The burden of persuasion with respect to the existence of the contractual right is a 'preponderance of the evidence' standard.").

*Deriv. Litig.*, 906 A.2d 27, 64 (Del. 2006) "[S]uch conduct constitutes classic, quintessential bad faith . . . ."[5]

The plaintiff also could make the necessary showing through persuasive evidence that the Committee members "intentionally fail[ed] to act in the face of a known duty to act, demonstrating a conscious disregard for [their] duties." *Id.* at 67. In this case, Section 7.9(b) established a known duty: the Committee members had to form a subjective belief that the Fall Dropdown was in the best interests of the Partnership. The plaintiff could prove breach by showing that the Committee members disregarded their known duty to make that determination. *Encore Energy*, 72 A.3d at 106

When evaluating whether the plaintiff carried its burden, this court "must focus on the subjective belief of the specific directors accused of wrongful conduct." *Id.* at 107. "Trial judges should avoid replacing the actual directors with hypothetical reasonable people." *Id.* Trial judges, however, are not telepaths. Objective facts therefore remain relevant to the extent they permit an inference that the defendants lacked the necessary subjective belief. *Id.* at 106-07. Where, as here, the Committee members testified that they believed the Fall Dropdown was in the best interests of El Paso MLP, the trial judge

---

[5] *Id.* The *Disney* case involved the fiduciary duty of loyalty. Good faith is not a separate fiduciary duty, but rather a prerequisite for loyal conduct. *Stone v. Ritter*, 911 A.2d 362, 369-70 (Del. 2006). The Delaware Supreme Court has relied on cases addressing the concepts of good faith and bad faith for purposes of the duty of loyalty when fleshing out the meaning of good faith in the limited partnership context. *See, e.g., DV Realty Advisors LLC v. Policemen's Annuity & Benefit Fund*, 75 A.3d 101, 110 (Del. 2013) (using formulations of bad faith from *Disney*); *Brinkerhoff v. Enbridge Energy Co., Inc.*, 67 A.3d 369, 373 (Del. 2013) (using a formulation from *Parnes v. Bally Entm't Corp.*, 722 A.2d 1243 (Del. 1999)).

must "make credibility determinations about [each] defendant's subjective beliefs by weighing witness testimony against objective facts." *Id.* at 106. The credibility determination turns in part on "the demeanor of the witnesses whose states of mind are at issue." *Johnson v. Shapiro*, 2002 WL 31438477, at *4 (Del. Ch. Oct. 18, 2002).

In this case, the trial record revealed numerous problems with the Fall Dropdown. None of these problems, standing alone, would have supported a finding that the Committee members did not act in subjective good faith. Even a combination of problems would not have been sufficient to overcome the presumption of good faith and the testimony of the Committee members. Indeed, the Fall Dropdown could have suffered from many flaws as long as the Committee members reached a rational decision for comprehensible reasons. The fact that the plaintiff might object to what the Committee did or argue that the Committee should have proceeded differently would not undermine the Committee's subjective good faith.

Unfortunately, when confronted with the problems in the record, the defense witnesses had little to offer. They had few specific recollections of the Fall Dropdown, and they testified instead about what they typically did or generally would have done when responding a dropdown.[6] In the context of the Fall Dropdown, the judgments that the Committee made in the official transaction documents stood in tension with their privately expressed views. The Committee's and Tudor's actions also contrasted with

---

[6] *See* Reichstetter 170-71, 184-86, 188, 197-98; Smith 419; Kuehn 522; Sult 540-43, 546 Simmons 615-17, 621.

36

how they approached the Spring and Summer Dropdowns. Most notably, the Committee members consciously disregarded the learning they supposedly gained from engaging in the Spring Dropdown, which involved the same core asset—approximately half of Elba.

For me, the number of problems reached a tipping point. The composite picture that emerged was one in which the Committee members went through the motions. They did not subjectively believe that approving the Fall Dropdown was in the best interests of the Partnership. They thought the Fall Dropdown would allow El Paso MLP to increase distributions on its common units while achieving Parent's goal of raising inexpensive capital. Neither factor meant the transaction was in the best interests of El Paso MLP. In this case, notwithstanding the formal transaction documentation to the contrary, the Committee did not decide that acquiring the balance of Elba at the price paid in the Fall Dropdown was in the best interests of El Paso MLP. In fact, the Committee members never learned enough about the price to make that determination.

## A. The Committee Members' Actual Views

The Committee members' emails provided persuasive insight into their views about Elba. In September 2010, after the Summer Dropdown but before the Fall Dropdown, Kuehn shared his opinions with Reichstetter and Smith. He regarded it as "really not in the best interests of [El Paso MLP] to have too much of its assets tied up in the LNG trade." JX 90. Kuehn thought El Paso MLP should *not* acquire more of Elba. Reichstetter responded, "It is as though you are reading my mind." *Id.*

Contrary to the Committee's preference for non-LNG assets, Sult decided that El Paso MLP would acquire the rest of Elba and proposed the Fall Dropdown. After Tudor

37

presented its preliminary views on value, Kuehn expressed significant doubts about the transaction. He reiterated his preference that El Paso MLP not acquire the balance of Elba and identified at least six strategic objections. JX 112.

These communications evidenced the Committee members' actual belief that it was not in the best interests of El Paso MLP to buy more of Elba in 2010. The contemporaneous documents convinced me that the Committee members did not want to acquire the balance of Elba and believed doing so was not in the best interests of El Paso MLP. But instead of sticking to their guns, the Committee accommodated Sult, just as the Committee caved in to Sult when negotiating the Spring Dropdown.

Kuehn's email revealed his preference for accommodation. After listing the reasons why acquiring the balance of Elba did not make sense for El Paso MLP, Kuehn suggested that his objections would be "mitigated" if Parent included the Southern interests in the transaction unconditionally. *Id.* In doing so, Kuehn rationalized away his objections to Elba to satisfy Parent's desires. Kuehn's recommendation may have improved the proposal by including an asset that he thought was good for El Paso MLP, but it did nothing to exclude from the Fall Dropdown the much larger asset that he thought was bad for El Paso MLP. Rather than saying no to the rest of Elba, Kuehn sought to "achieve [Parent's] objective." *Id.*

By approving the Fall Dropdown, the Committee subordinated their independently held views to Parent's wishes. Having evaluated the record, I find that the members of the Committee did not want to acquire the balance of Elba in 2010 and believed subjectively that doing so was not in the best interests of El Paso MLP.

**B.** **The Committee Members' Preoccupation With Accretion**

The Committee members testified at trial that they believed the Fall Dropdown was in the best interests of El Paso MLP, but their testimony seemed over-prepared and artificial. After evaluating their testimony against the record, I could not credit their assertions. Rather than concluding that the Fall Dropdown was in the best interests of El Paso MLP, the Committee members determined that the Fall Dropdown was accretive, *i.e.,* it would enable El Paso MLP to increase distributions to the common units. For purposes of Special Approval, that was all the Committee thought was required.

The evidence at trial convinced me that the Committee members did not perceive their job to be evaluating whether the Fall Dropdown was in the best interests of El Paso MLP as an entity. They believed that they were supposed to determine whether the Fall Dropdown would be good for the holders of common units, and they based that judgment on whether the deal would be accretive. The accretion lens was so powerful that the Committee members viewed every one of Parent's opening proposals as fair, simply because distributions could have increased. Reichstetter explained:

> As we measured fairness—you'll remember I said that our job was to look out for the best interests of the unaffiliated unitholders. And to do that, as you well know, in this industry, cash is the key to everything. And cash distributions are the key to everything, increasing cash distributions to the unitholders.
>
> I don't know—don't recall of any of the [dropdown] proposals that were made to us where any of the proposals and the price associated with them would have resulted in a situation where there was not accretion and there was not the ability to increase dividends.
>
> . . . I think it's fair to say that for each of the transactions that you're referring to, all of the drops, that the initial analysis showed us that none of

them would have resulted in anything but an increase in distributions to the unitholders.

Reichstetter 47-48; *see also* Sult 556 (observing that even at Parent's opening price for the Spring Dropdown, the Committee "still had an accretive transaction that allowed them to continue to increase the distributions to the LPs."). Throughout trial, Reichstetter, Smith, and Kuehn emphasized that the Committee examined the Fall Dropdown (indeed all the dropdowns) from the point of view of the holders of common units, not El Paso MLP,[7] and that they focused on whether the transaction would be accretive.[8]

---

[7] *See* Reichstetter 40 ("[T]he job of this committee isn't to say fair or not fair. The job of the committee is to look after the best interests of the nonaffiliated unitholders."); *id.* at 164 ("[T]he job, quite simply, is to represent the best interests of the unaffiliated unitholders."); Kuehn 455 ("My job, and the job of the committee, was to get a price that was fair to the unitholders of the partnership.").

[8] Reichstetter 81 ("What's important is what I brought up before: Is there sufficient cash flow from the transaction to increase distributions?"); *id.* at 181-82 (testifying that the Committee's advisors told them that "The only thing that matters is distributable cash."); *id.* at 193 ("The single most important thing in this world is to – to be able to increase distributions. And you can do that if you're doing . . . enough dropdowns"); *id.* at 211 (explaining importance of accretion analysis to Committee in evaluating Fall Dropdown because "[a]s we've said numerous times, it's the only way that distributions to the unitholders can grow"); *id.* at 214 ("You need the accretion to be able to increase the payout of cash to your unitholders."); Smith 424 (justifying Fall Dropdown by looking "at the accretion associated with that transaction"); *id.* at 431 (stressing that "the transaction had to be accretive, and then the level of accretion, which had the potential for allowing the company to ultimately increase its cash flow and cash distributions, would have been very important"); Kuehn 450-51 ("I wanted the partnership to acquire those assets at a price that would enable them to continue to increase the cash flows available for distributions"); *id.* at 490-91 (testifying that the Committee's job was to achieve a price "so that the cash flows from the asset would be accretive and sufficient to continue increases in the distribution to the unitholders"); *id.* at 508-09 ("[I]n an MLP, cash is king. You are acquiring an asset with the purpose of increasing your ability by reason of the cash flow of the asset to increase the distributions you are able to pay"); *id.* at 520 (explaining that he approved the Fall Dropdown because

The fundamental problem with this approach, as Tudor's representative admitted, is that '[a]ccretion is not part of valuation." Simmons 718. "Deals that strengthen near-term EPS and deals that dilute near-term EPS are equally likely to create or destroy value. Bankers and other finance professionals know all this, but as one told us recently, many nonetheless 'use it as a simple way to communicate with boards of directors.'" Richard Dobbs, Bill Huyett & Tim Koller, *The CEO's Guide To Corporate Finance*, McKinsey Quarterly, Nov. 2010, at 5.

An accretion analysis says nothing about whether the buyer is paying a fair price. Accretion depends on how the acquisition is financed, and "anyone can make a deal look accretive just by playing with the consideration used." Vincent J. Calabrese, *Economic Value Added: Finance 101 on Steroids*, The Journal of Bank Cost & Management Accounting, Jan. 1999, at 6. If the acquisition is financed with cash on hand, then it will be accretive at any price. Add debt to the mix, and the acquisition will be accretive if the incremental cash flow from the investment exceeds the cost of debt service.[9] If financed with equity, then the acquisition will be accretive if the incremental cash flow from the

it was "a fair and . . . advantageous transaction for the benefit of the LP units and unitholders, because it would produce cash flows that would enable the partnership to continue to increase distributions"); *see also* Sult 542 (noting that the "a significant focus of the conflicts committee" was always whether the transaction was "accretive to the MLP on a distributable cash flow basis").

[9] To use a simplistic example, assume an entity purchases an asset that generates $1,000 per month in cash and finances the purchase entirely with debt. As long as the monthly debt service is less than $1,000, the amount of available cash will increase, and the transaction will be accretive.

investment exceeds the pre-acquisition level of distributions per share multiplied by the number of shares issued to finance the transaction.[10]

Focusing on accretion did not "tell [the Committee] anything about the deal's long-term potential to add value [because] [s]ound decisions about M&A deals are based on their prospects for creating value, not on their immediate EPS impact." Alfred Rappaport, *Ten Ways to Create Shareholder Value*, Harvard Business Review, Sept. 2006, at 3. It is axiomatic that "earnings per share are not a reliable indicator of value creation or destruction." PIERRE VERNIMMEN, PASCAL QUIRY, MAURIZIO DALLOCCHIO, YANN LE FUR & ANTONIO SALVI, CORPORATE FINANCE: THEORY AND PRACTICE, 823 (4th ed. 2014). "Transactions can be structured to be EPS accretive even if they destroy value for the shareholder." Martin Ellis, *Goodwill Accounting: Everything Has Changed and Nothing Has Changed*, 14 Journal of Applied Corporate Finance 103, 104 (2001).

The Committee fixated myopically on accretion to the holders of the common units. In doing so, they failed to carry out their known contractual obligation to determine whether the Fall Dropdown was in the best interests of El Paso MLP.

---

[10] To use another simplistic example, assume that an entity has issued 1,000 common units and pays a quarterly distribution of 10 cents per unit. Assume the entity purchases an asset that generates $1,000 per month in cash. The asset will generate $3,000 per quarter, or enough cash to provide the pre-transaction distribution of 10 cents per unit for 30,000 units. As long as the acquirer issues fewer than 30,000 units to acquire the asset, there will be cash left over which, when distributed across all of the post-transaction units, will increase the total available for distributions, and the transaction will be accretive.

## C.    Conscious Disregard Of Lessons Learned

Unlike a committee that actually set out to determine whether a dropdown was in the best interests of El Paso MLP and, if necessary, say "no" to Parent, Kuehn, Smith, and Reichstetter consciously disregarded what they learned during the spring. Generally speaking, "showing that the Conflicts Committee members may have negotiated poorly does not permit a reasonable inference that they subjectively believed they were acting against [the Partnership's] best interests." *Encore Energy*, 72 A.3d at 108. In *El Paso II*, the court applied this principle when granting summary judgment in favor of the defendants on the Spring Dropdown. In the Fall Dropdown, however, the Committee did more than simply negotiate poorly. After receiving market evidence that El Paso MLP had paid too much, and after deciding that they would have to do better the next time, the Committee disregarded these expensive lessons. Rather than returning to their independent assessments of value, they allowed the price from the Spring Dropdown to anchor their counter. Then, after Sult restructured the transaction, the Committee members consciously ignored their own commitment to examine the transaction components separately, signed off on Parent's aggregate price, and blindly gave up the minimal price reduction they had obtained.

The Committee members' emails provide insight into their views on value. In early March 2010, after reviewing Tudor's preliminary financial analysis, Kuehn believed that a price in the range of $725 million to $780 million was fair for a 51% interest. *See* JX 57. Reichstetter came to a similar conclusion. JX 61. Everyone now agrees that majority-versus-minority ownership did not matter when pricing Elba

43

(contrary to Tudor's position when advising on the Spring Dropdown), so a 49% interest was worth $711 million to $764 million.

Despite having this view, the Committee agreed to pay $963 million in the Spring Dropdown. Having heard the trial testimony and considered the record, I attribute that gap to the negotiating dynamic Reichstetter faced when bargaining with a determined controller. Confronted by Sult, and wanting to please Parent management, Reichstetter abandoned the ranges that the Committee members discussed internally and countered at $860-870 million. Even then, Sult pushed aggressively and back-channeled with Tudor. Reichstetter responded with his conciliatory email. *See* JX 63. He and Sult quickly agreed on $963 million, approximately 26% higher than the Committee members' assessment.

When granting summary judgment for purposes of the Spring Dropdown, I held that Reichstetter's ineffective approach and the resulting pricing disparity did not, standing alone, support an inference of bad faith. *El Paso II*, 2014 WL 2768782, at *15. Delaware law recognizes that directors can err. Humans inevitably do. Even what seems in hindsight to be an outsized error will not cause a court to question a director's good faith. *See generally Gagliardi v. Trifoods Int'l, Inc.*, 683 A.2d 1049, 1051-53 (Del. Ch. 1996) (Allen, C.).

For the Fall Dropdown, however, the Committee members had the benefit of a costly education about Elba. The market reaction indicated that El Paso MLP overpaid, and the Committee understood that. Kuehn wrote to his fellow Committee members, saying "The next time we will have to negotiate harder." JX 76. Then, in the Fall Dropdown, Parent proposed a price of $948 million. Tudor determined that this price was

*almost $25 million more on a percentage basis than in the Spring Dropdown. See* JX 111 at 43; JX 112; Kuehn 480. Yet the LNG market had deteriorated further in the interim, and Parent was asking was for this price for a minority interest, even though the high price for the Spring Dropdown had been justified as an acquisition of a majority interest.

Despite their experience in the spring, the Committee allowed the price of the Spring Dropdown to set the bar. Despite having previously been on the short end of the minority acquisition argument, the Committee and Tudor never turned it back on Parent. Smith 358; Kuehn 458, 463; Simmons 704-705. And despite knowing about recent arm's length acquisitions of LNG assets, the Committee did not obtain or use the information to push back against Parent. Rather than returning to their independent assessments of value from the spring, they countered at $900 million, a price reduction of just 3%. Sult immediately accepted it.

Matters then grew worse. Sult revised Parent's proposal to include 15% of Southern. Parent did not provide separate prices for the two assets, so it was impossible to determine how the deal priced either individually. Despite Reichstetter's earlier instruction and the obvious reasons for evaluating the components separately, Tudor did not analyze the two assets separately for the Committee.

Internally, however, Tudor did analyze the components separately, and the plaintiff's expert used Tudor's internal analyses to unpack the price. At a minimum, under Tudor's analysis, El Paso MLP paid $931 million for 49% of Elba, more than the $900 million that Sult agreed to by accepting Reichstetter's ask. *When Sult changed the deal, he slipped in a higher price and returned to the pricing from the Spring Dropdown.*

Because of their experience with the Spring Dropdown, the Committee knew better. They consciously disregarded their own independent and well-considered views about value when confronted by Sult, even after the market had confirmed their views. They consciously disregarded their desire for separate analysis of the components of the Fall Dropdown, even though it was obvious that separate pricing information was needed. They even abandoned the price improvement they negotiated in the Fall Dropdown. Their actions evidenced conscious indifference to their responsibilities to El Paso MLP.

**D. Tudor's Work Product**

Tudor's work product further undermined any possible confidence in the Committee. "The scope and details of the fairness opinion and Tudor's analysis [are] fair game for the plaintiffs to use in an effort to support an inference of bad faith." *El Paso I*, 2014 WL 2819005, at *18. Tudor's actions demonstrated that the firm sought to justify Parent's asking price and collect its fee. Tudor's approach made it all the more likely that the Committee practiced appeasement as well.

Tudor made a minimal effort in connection with the Fall Dropdown. Internally, Tudor viewed the Fall Dropdown as little more than an update of its work on the Spring Dropdown. *See* JX 114. It showed. After Parent formally extended its proposal, Reichstetter and the Committee asked Tudor to consider whether the weakening LNG market undermined the attractiveness of the assets. To evaluate these issues, Tudor simply asked Parent. *See* JX 103. Not surprisingly, Parent management assured Tudor that there had been no changes and that the assets remained attractive. *Id.*

46

Reichstetter and the Committee also asked Tudor to re-evaluate the Service Agreements and the strength of the guarantees. Tudor did not perform any new analyses. It took a slide from its March 24, 2010 presentation on the Spring Dropdown and *reduced the amount of information so that the guarantees looked better*.

Reichstetter and the Committee similarly asked Tudor to examine recent LNG transactions. Tudor tasked two analysts with searching for public information. They found the press releases for the transactions but nothing else. To calculate the multiples Reichstetter wanted, Tudor needed the amount of debt the entities carried. One of the analysts discovered and informed the lead Tudor banker that Parent managed Gulf LNG. Kuehn and Smith knew this fact as well. Smith 367, 434; Kuehn 477. But despite knowing about Parent's role, Tudor did not ask Parent for the information.

At trial, everyone except Smith testified that no one thought about asking Parent. Smith testified that he decided not to suggest that Tudor ask Parent for the information. Smith 444. Tudor's representative asserted that it would have been "atypical" to ask a counterparty for data. Simmons 714, 717. For the dropdowns with Parent, that was inaccurate. Tudor *always* asked Parent for information. Each dropdown began with a due diligence session between Parent and Tudor. Tudor then asked more questions of Parent as the process went along. Sult testified that Parent would have provided "anything that [Tudor] would ask for." Sult 572; *see also id.* at 545-46.

Somewhat inconsistently, the defense witnesses also tried to justify their failure to obtain information by arguing that the LNG transactions were not comparable. *See* Reichstetter 107; Smith 385, 435; Kuehn 479-480, 522; Sult 564. This was a litigation-

47

driven construct. There were no contemporaneous documents describing the transactions as not comparable. To the contrary, Reichstetter requested information about the deals and Tudor sought to analyze them because they were comparable.

In addition to these examples of nonfeasance, Tudor manipulated the deal process through malfeasance. It is often said that valuation is more art than science, but this aphorism reflects the need for professionals to make case-specific judgments. For the dropdowns, Tudor practiced a different kind of art: the crafting of a visually pleasing presentation designed to make the dropdown of the moment look as attractive as possible. This was a case in which "the financial advisor, eager for future business . . . , compromises its professional valuation standards to achieve the controller's unfair objective." *Gerber v. Enter. Prods. Hldgs, LLC*, 67 A.3d 400, 420-21 (Del. 2013). Tudor manipulated its presentations in unprincipled ways to justify the deal.

The most glaring example was Tudor's precedent transaction analysis. For the Spring Dropdown, Tudor divided its precedent transactions into a minority-acquisition group and a majority-acquisition group. In its later presentations, Tudor only showed the majority-acquisition group to the Committee because the Spring Dropdown involved a 51% interest in Elba.

For the Summer Dropdown, Tudor initially divided the precedent transactions into the same two groups. The Summer Dropdown was a minority acquisition, so Tudor should not have shown the range for controlling acquisitions. But that range made the Summer Dropdown price look good, so Tudor kept it. Instead, Tudor manipulated its analysis more subtly by shifting an acquisition of a 50% interest from the control group

48

to the non-control group. This change created a new upper bound for the non-control group. Without that change, the Summer Dropdown transaction multiple would have exceeded the range for non-control transactions. Then, after showing the Committee both groups, Tudor recognized that there was no longer any optical benefit to separating the groups and combined the precedents into a single analysis.

In the Fall Dropdown, Elba was the focus. If Tudor's dyadic analysis from the spring was the correct approach for valuing Elba, then Tudor should have used it in the fall. If Tudor no longer believed in it, then Tudor should have told the Committee and explained why. Instead, Tudor lumped all of the precedents together without calling the change to the Committee's attention and explaining it.

During this litigation, the defense witnesses offered different stories about these changes. In his deposition, the Tudor representative stood by the distinction between majority and non-majority acquisitions, but said he combined the data sets because the sample size was small and two of the precedents were El Paso MLP dropdowns. In his deposition, Reichstetter defended the distinction, at least for purposes of the Spring Dropdown, by claiming that El Paso MLP was purchasing "optical control." In his deposition, Smith also defended the distinction, claiming that for purposes of the Spring Dropdown, the fact that El Paso MLP purchased a majority interest was "an important difference," because it enabled El Paso MLP to consolidate the assets on its financial statements and sell the assets to a third party for a control premium.

By the time of trial, the witnesses had different stories. The Tudor representative contended that his firm made a judgment that the pricing of the transactions did not turn

on majority ownership. He tried to claim that the analysis was "atypical" and that Tudor merely included it "for illustrative purposes." Simmons 625. The Committee members similarly testified that they did not believe there should be a pricing difference between majority or minority stakes. Reichstetter seemed particularly eager to give speeches on this issue. *See* Reichstetter 52, 54, 56-61, 69-70. The Committee members also were thoroughly prepared to claim that they focused exclusively on the DCF analysis because the comparable company and precedent transaction methodologies were unreliable. Reichstetter 48; Smith 395; Kuehn 484. Reichstetter was quite strident on these points, asserting that "multiples don't determine value" and that "[p]eople don't use multiples to do valuation."[11] Reichstetter claimed that the Committee deconstructed the DCF analysis and that "[o]ne of the many questions that we always ask[ed] is, 'What is the appropriate discount rate?'" Reichstetter 140; *see also id.* at 147 ("We also quizzed Tudor as to, in general, what might be customary in the context of the weighted cost of capital.").

The contemporaneous documents did not support these explanations. There was no indication of concern about sample size or the inclusion of precedents involving Parent. Nor was there any contemporaneous objection to the concept of differential

---

[11] Reichstetter 60-61; *see also id.* at 62 ("We've never used multiples to justify any price."); *id.* at 69 (describing multiples as "misleading" and saying "[i]t's not something we looked at or focused on."); *id.* at 134 ("We, as a group, didn't look at multiples . . . we didn't look at multiples to help determine valuation at all."); *id.* at 181 ("I think the relevancy for valuations of these LNG assets, or basically any assets, with rare exception, the relevancy of these historic deals and historic data and multiples associated with them is maybe not negligible but pretty close."); *id.* at 182 ("The relevance [of multiples] to us on valuation is, as I've just stated, almost nonexistent.").

pricing for a majority interest. There were no internal Tudor documents suggesting a change in policy on that question or a decision to retain the precedent transaction analysis as "illustrative." To the contrary, Tudor cut anything that was not "core" to its opinion.

The defense witnesses' trial testimony about ignoring multiples conflicted with other admissions and extensive evidence in the record:

- Reichstetter admitted that investment banks routinely use multiples and the comparable transaction methodology. Reichstetter 100-102.

- Reichstetter could not explain, despite his avowed discomfort with any type of multiples analysis, why he permitted Tudor to use multiples derived from its comparable company analysis to calculate the terminal value in its DCF methodology. Reichstetter 153-54.

- In their internal communications, the Committee members used precedent transaction multiples to evaluate the dropdowns.

- Parent's management team used precedent transaction multiples to evaluate the dropdowns.

- At trial, Smith rejected Reichstetter's claim about ignoring multiples. He admitted that the Committee considered the multiples generated by the comparable company and precedent transaction analyses. Smith 336-37.

- At trial, Tudor's representative rejected Reichstetter's claim about ignoring multiples. He admitted that a precedent transaction analysis is a "very commonly used" measure of fairness. Simmons 706. Every Tudor presentation included one.

- At trial, Tudor's representative rejected Reichstetter's claim about exclusive reliance on DCF. Tudor's representative testified that Tudor always used the comparable company, precedent transaction, and DCF methodologies (Simmons 650), that "there's no single analysis that we rely on exclusively" (Simmons 632), that "we try to look at the analysis in aggregate" because "[e]ach one has its own benefits and limitations" (Simmons 634), and that Tudor presented the precedent transactions analysis to the Committee members and discussed it with them (Simmons 635).

51

The idea that the Committee questioned Tudor about the inputs to its DCF analysis and delved into the WACC calculation was hyperbole. Contrary to Reichstetter's trial testimony, the other two Committee members said they had not focused on this level of detail. Smith 396, 399-400; Kuehn 485, 488. The Committee members did not receive any explanation from Tudor about how it constructed its DCF methodology for the Fall Dropdown. *See* Smith 395-96, 403; Simmons 726, 732. Tudor did not provide information to the Committee, and the Committee did not ask any questions about it. *See* Smith 396, 403; Kuehn 486-88; Simmons 726, 732.

Moreover, in terms of substance, Tudor did not use appropriate numbers for its DCF analysis. To value Elba, which was an LNG terminal, Tudor used El Paso MLP's cost of capital. This was incorrect for two reasons. First, it meant that Tudor did not derive a measure of the risk inherent in the cash flows of the asset; it used a measure of the risk in the cash flows of the acquirer. Second, it meant that Tudor valued an LNG import terminal using a cost of capital that reflected the materially lower risks associated with a domestic pipeline business. Tudor's representative admitted that Tudor erred by using El Paso MLP's cost of capital. Simmons 721.

Tudor also manipulated its discount rate. When analyzing the Spring Dropdown, Tudor's build-up method produced a range from 8% to 13.8%. For the Summer Dropdown, Tudor's build-up method produced a range from 8% to 14.5%. Although Tudor claimed to have used the same inputs for the Fall Dropdown, Tudor cut off the upper bound at 12%. Tudor could not provide any explanation for this move, which its representative claimed was an exercise of "judgment and experience." Simmons 650-51;

52

*see id.* at 656. If Reichstetter had asked about the discount rate, as he claimed at trial, he would have known this. Instead, he erroneously believed that Tudor was "uniform in the approach to every one of these transactions." Reichstetter 50.

Tudor manipulated other DCF inputs as well. In the spring and summer, Tudor used a single cash-flow projection period and calculated terminal value using exit multiples of 8x, 10x, and 12x. In the fall, Tudor prepared three different DCF valuations, one with a five-year projection period, another with a ten-year period, and a third with a fifteen-year period. Tudor also used four exit multiples. Then, in later books, Tudor returned to a single, five-year period and used a different set of three exit multiples.

A financial advisor obviously need not evaluate every transaction the same way. There often will be good and sufficient reasons to revise or update an analysis. But one would expect a financial advisor to have reasoned explanations for its changes, and it would be surprising if every one of the changes moved the analysis in the same direction.

For purposes of the Fall Dropdown, Tudor made numerous changes to its methodologies. Tudor did not identify or explain any of its methodological changes to the Committee, and the Committee did not notice them. Simmons 704-705; *see* Reichstetter 67; Smith 351-53; Kuehn 458, 524. When pressed at trial, Tudor's representative ultimately could offer little more than the claim that in every case, Tudor exercised judgment. *See* Simmons 652-53, 703. Every one of Tudor's judgments benefitted Parent, not El Paso MLP. *See* Simmons 696, 699-700.

Tudor failed to perform the real work of an advisor to a committee. Instead of helping the Committee develop alternatives, identify arguments, and negotiate with the

53

controller, Tudor sought to make the price that Parent proposed look fair. Tudor's real client was the deal, and the firm did what it could to justify the Fall Dropdown, get to closing, and collect its contingent fee. Rather than helping the Committee bolster its claim to have acted in good faith, Tudor undercut it.

## E.      The Court's Finding On The Question Of Subjective Good Faith

Under the LP Agreement, each Committee member had an affirmative duty to conclude that the Fall Dropdown was "in the best interests of the Partnership." LPA § 7.9(b). In this case, an accretion of points creates a picture. Standing alone, any single error or group of errors can be excused or explained. But at some point, the story is no longer credible. This was such a case.

Despite their trial testimony, the Committee members did not conclude that the Fall Dropdown was "in the best interests of the Partnership." LPA § 7.9(b). They viewed El Paso MLP as a controlled company that existed to benefit Parent by providing a tax-advantaged source of inexpensive capital. They knew that the Fall Dropdown was something Parent wanted, and they deemed it sufficient that the transaction was accretive for the holders of common units. The Fall Dropdown was the fifth since El Paso MLP's IPO, and the participants had established a comfortable pattern. Everyone understood the routine and expected the transaction to go through with a tweak to the asking price. No one thought the Committee might bargain vigorously or actually say no.

The Committee members and Tudor went through the motions, but the substance was lacking. The Committee members acceded to the Fall Dropdown despite believing that El Paso MLP should not acquire more of Elba in 2010. They agreed to pay the same

price as in the Spring Dropdown despite knowing that El Paso MLP paid too much in the earlier transaction. And they gave up what little price improvement they obtained by disregarding their own commitment to evaluating the components separately. The quality of Tudor's work product provided an indication of the true purpose of the exercise.

Because the Committee members disregarded their known duty to determine that the Fall Dropdown was in the best interests of El Paso MLP, they did not act in good faith. Consequently, the General Partner breached the LP Agreement by engaging in the Fall Dropdown.

## F.     Damages For Breach of Contract

A claim for breach of contract, such as the LP Agreement, has three elements: "first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). "To satisfy the final element, a plaintiff must show both the existence of damages provable to a reasonable certainty, and that the damages flowed from the defendant's violation of the contract." *eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, 2013 WL 5621678, at *13 (Del. Ch. Sept. 30, 2013). "While courts will not award damages which require speculation as to the value of unknown future transactions, so long as the court has a basis for a responsible estimate of damages, and plaintiff has suffered some harm, mathematical certainty is not required." *Thorpe v. CERBCO, Inc.*, 19 Del. J. Corp. L. 942, 963 (Del. Ch. Oct. 29, 1993) (Allen, C.).

"[T]he standard remedy for breach of contract is based upon the reasonable expectations of the parties *ex ante*." *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001). "It is a basic principle of contract law that remedy for a breach should seek to give the nonbreaching the party the benefit of its bargain by putting that party in the position it would have been but for the breach." *Genencor Int'l, Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 11 (Del. 2000). "Expectation damages thus require the breaching promisor to compensate the promisee for the promisee's reasonable expectation of the value of the breached contract, and, hence, what the promisee lost." *Duncan*, 775 A.2d at 1022. Here, the plaintiff argues that because the General Partner breached the LP Agreement, El Paso MLP paid and Parent received too high a price for Elba. The measure of damages is the difference between the transaction price and what a 49% interest in Elba was worth.

Arriving at an accurate valuation of Elba in November 2010 requires an assessment of the reliability of Elba's future cash flows. The Committee treated the revenues under the Service Agreements as if they were sure things. Although the Committee members held that view in subjective good faith, it was not an accurate or reasonable assessment.

As noted, the Service Agreements were not with Shell and British Gas themselves, but rather with special purpose entities that had no assets of their own. When Parent negotiated the Service Agreements with Shell and British Gas, Parent attempted to negotiate full guarantees from solvent affiliates. Shell and British Gas resisted. The guarantees that Parent obtained covered only 17% of the total revenues under the Service Agreements, leaving 83% at risk. The fact that Shell and British Gas sought to minimize

their guarantees indicates that those entities wanted to preserve their ability to terminate or force a renegotiation.

When not selling Elba to El Paso MLP, Parent recognized that the bulk of the revenues under the Service Agreements were at risk. In its Form 10-K for the calendar year that ended on December 31, 2010, Parent disclosed the risks of termination and renegotiation and explained that "[t]he loss of any material portion of the contracted volumes of these customers, as a result of competition, creditworthiness, inability to negotiate extensions, or replacements of contracts or otherwise, would have a material adverse effect on [Elba]." JX 54 at 40. Yardley and Sult signed the Form 10-K.

Parent had actual experience with the termination of a long-term supply agreement at Elba. Parent's predecessor, Sonat, built the terminal during the 1970s, a period of rising prices and high demand. By the early 1980s, the situation had reversed. Sonatrach, an Algerian national oil company, had a long-term contract for the terminal. When conditions turned, Sonatrach walked. The terminal sat idle for 20 years.

In the early 2000s, higher prices and declining domestic production rekindled interest in LNG imports. Existing terminals, including Elba, were brought back on line. Then the market changed again in 2008, when the shale gas revolution brought large quantities of domestic gas to market. By 2010, the North American market for LNG imports had dropped precipitously.

Given this economic history, it was apparent in 2010 that there was substantial risk in the LNG import business generally and to Elba's cash flows specifically. The risk was not limited to a total breach by Shell or British Gas. A more likely possibility was that

57

Shell or British Gas would use the leverage of a possible termination to force a renegotiation. Indeed, in July 2010, StatOil had announced publicly that it had written down the value of its capacity agreement with the Cove Point LNG terminal to reflect "an onerous contract," suggesting that the risk of renegotiation was increasing.

Tudor and the defendant's expert did not account for any risk to Elba's cash flows. Dr. Zachary Nye, the plaintiff's expert, did. He separately estimated the present value of the guaranteed cash flows and the non-guaranteed cash flows. To reflect the credit risk associated with the former, he discounted them at the average yield to maturity of Shell's senior corporate bonds maturing in 2038 and 2040, or 5.581%.

For the non-guaranteed portion, Nye looked to an investment of comparable risk and term, *i.e.*, an LNG import terminal connected to major U.S. natural gas markets. Although data was not available for thirteen of the fourteen North American LNG import terminals that were operational or under construction, he found an optimal comparable terminal in the Sabine Pass LNG terminal. It was owned and operated by Cheniere Energy Partners, L.P. ("CQP"), a master limited partnership with publicly traded debt and equity securities since 2007. The Sabine Pass terminal was CQP's sole asset from inception through 2010, making it a pure-play investment with historic risk exposure isolated to the supply and demand for U.S. LNG imports. Like Elba, the Sabine Pass terminal had sold its full capacity under a 20-year, firm commitment agreement. Like Elba, the counterparties were subsidiaries of more credit-worthy entities who had guaranteed the subsidiaries' performance. Using data from CQP's publicly traded securities, Nye calculated CQP's WACC to have been 11.876% in March 2010.

Because of the greater creditworthiness of the CQP guarantees, CQP's WACC understated the risk associated with Elba. To calculate the non-guaranteed risk implied by CQP's WACC, Nye turned to option theory. Using standard sources, Nye calculated that the cost of capital for a non-guaranteed investment in a U.S. LNG import terminal was 14.868%. Nye discounted Elba's non-guaranteed cash flows using this figure.

For his terminal value, Nye used a multiple of 9.1x EBITDA, derived from the Gulf LNG sale in February 2010 and from Parent's internal valuations of Gulf LNG and Elba, which used a 20-year terminal value of 9x EBITDA. Nye discounted his terminal value using a rate of 14.868%.

With these inputs, Nye calculated that the total enterprise value of Elba at the time of the Fall Dropdown was $1.551 billion. The value of 49% interest was $760 million. El Paso MLP paid at least $931 million for 49% of Elba in the Fall Dropdown. Accordingly, El Paso MLP suffered damages of $171 million from the Fall Dropdown.

As cross-checks, Nye compared his calculations with other indicators. In March 2010, Gulf LNG sold at an implied multiple of 9.1x 2010 EBITDA. Elba's 2010 EBITDA was $180 million, so that data point implied that the value of 49% of Elba was $803 million. In April 2010, Freeport LNG sold at an implied multiple of 8.2x 2010 EBITDA. Using that figure, Elba's implied value was $727 million. These data points framed Nye's calculation. Nye also conducted an event study based on the stock market reaction to the Fall Dropdown. The event study suggested a loss of value of approximately $285 million, implying an overpayment by El Paso MLP in that amount. This data point indicated that Nye's figure was conservative.

This decision adopts Nye's calculation of the overpayment. The General Partner breached the LP Agreement and caused $171 million in damages.

## III.     CONCLUSION

Judgment is entered in favor of the defendants other than the General Partner with respect to the Fall Dropdown. The General Partner is liable for breach of contract in connection with the Fall Dropdown. The amount of damages is $171 million. The plaintiff is entitled to costs as the prevailing party.